No. 112,580

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF
PB&R, A LIMITED LIABILITY
PARTNERSHIP.

SYLLABUS BY THE COURT

1.

When a court supervises the dissolution of a partnership, it acts as a court of equity. A court sitting in equity has the discretion to determine what is fair and equitable under the circumstances unless the issue is specifically governed by statute or, in the case of partnership dissolution, the partnership agreement.

2.

Under the facts of this case, the district court did not abuse its discretion in supervising a partnership dissolution.

Appeal from Sedgwick District Court; MARK VINING, judge. Opinion filed July 15, 2016. Affirmed.

*Marc A. Powell*, of Powell Law Office, of Wichita, for appellant.

*Elaine Reddick*, of Reddick Law Office, of Wichita, for appellee.

*Jeffery R. Brewer*, of Jeffery R. Brewer, P.A., of Wichita, for appellee.

Before GARDNER, P.J., LEBEN, J., and HEBERT, S.J.

LEBEN, J.: Marc A. Powell, Jeffery R. Brewer, and Elaine Reddick were law partners, but they weren't able to agree on how to wind up their business affairs after two of the three decided to leave. Powell asked the district court to supervise the dissolution; after a trial, the district court made orders that would dispose of all of the partnership's assets and debts. Powell has appealed nearly every aspect of the decision.

Powell argues that the court wrongly interpreted the partnership agreement and the Kansas Revised Uniform Partnership Act, leading to incorrect rulings about the partners' capital accounts, the amounts of money owed back to the partnership for advanced client expenses, the payments on a loan with Intrust Bank, other funds the partners owe back to the partnership, and the distribution of physical assets. Powell also challenges the court's appointment of Reddick as the partner in charge of wind-up. Finally, he argues that the court failed to independently analyze and consider each of his claims and should have granted him a new trial.

When supervising dissolution of a partnership, the district court acts as a court of equity, giving it the discretion to determine what is fair and equitable under the circumstances. We find no error here in the district court's interpretation of the Kansas Revised Uniform Partnership Act or the parties' partnership agreement. Nor do we find that the district court exceeded its discretion in determining a fair and equitable resolution of the disputes between the partners. We therefore affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Powell and Brewer started their limited-liability partnership in 1997. Reddick became a partner in 2000. A few other partners have come and gone, but since 2002, Powell, Brewer, and Reddick have been the only partners. The partnership's name has changed some over the years, but loan documents relevant to this appeal show it as

2

Powell, Brewer, Reddick, L.L.P.; all parties have referred to it as PB&R in the briefing to our court.

Based on their original capital contributions—the money they initially paid into the partnership—Powell and Brewer each own 38.5% of the partnership capital, and Reddick owns 23%. The controlling partnership agreement is dated December 31, 2001.

The agreement states that the partners will determine by majority vote the monthly overhead costs for themselves and any of-counsel attorneys (lawyers who associated with PB&R but had no ownership interest). In practice, according to trial testimony, Powell, as the managing partner, was primarily in charge of determining the total overhead budget and each person's monthly share. The agreement defines "monthly overhead" to include the cost of a receptionist, a bookkeeper, and an accountant, as well as phone service, computer services, postage, and legal research.

The partnership agreement also describes a loan from Intrust Bank that Powell is individually responsible for. The agreement says that Powell can use the partnership's overhead revenue to repay the loan, but if that revenue isn't adequate, Powell has to pay back the loan personally. The agreement also includes some terms about the partners' capital accounts and provides that partners are personally responsible for advancing client expenses.

According to the agreement and the trial testimony, the partnership followed an "eat what you kill" compensation plan—the partners didn't share profits. So compensation for Brewer and Reddick was straightforward: they always received 100% of their earned fees minus their expenses (which included overhead calculated under the agreement). Their monthly "draw sheets" listed the fees they had earned that month and subtracted their overhead and expenses; the remainder was their monthly take-home pay.

According to trial testimony, Powell's compensation was less straightforward—he was not guaranteed 100% of his earned fees minus expenses. After Brewer and Reddick received their paychecks, Powell received whatever was left over. Sometimes that amount was more than Powell's earnings minus expenses, and sometimes it was less. Practically speaking, this arrangement meant that if Powell hadn't set the amount others paid for overhead at a sufficient level, then Powell absorbed the partnership's losses. It also meant that if the partnership had any excess income (presumably because overhead payments exceeded actual overhead expenses), Powell would receive that. But when Powell personally absorbed a partnership loss, his partnership capital account reflected the benefit to PB&R as a whole—his capital account (reflecting his contributions to the firm) increased by the amount of the loss.

In March 2012, Reddick and Brewer gave notice that they wanted to leave the partnership, and the partnership dissolved on June 30, 2012. In October 2012, Powell filed a petition for judicial supervision of dissolution. At a 4-day trial in April 2014, Reddick and Brewer both testified, as did PB&R's bookkeeper, Dawn Powell, and its accountant, Tom DeBerry. Reddick also presented expert testimony from an accounting professor, Dr. Jeffery Quirin, who provided a sample wind-up plan and explained the accounting process for winding up a partnership under the Kansas Revised Uniform Partnership Act. Powell did not testify.

After the parties presented their evidence, the district court made some preliminary rulings and asked each of the parties to propose a wind-up plan. On June 2, 2014, Powell and Reddick each argued for their proposed plan, and Brewer supported Reddick's proposal. The district court chose Reddick's plan, with minor modifications, and appointed her to oversee PB&R's wind-up.

Powell has appealed to this court.

4

ANALYSIS

When a court supervises the dissolution of a partnership, it acts as a court of equity. *Peterson v. Peterson*, 186 Kan. 234, Syl. ¶ 1, 349 P.2d 870 (1960); see *Eaton v. Johnston*, 235 Kan. 323, 328, 681 P.2d 606 (1984) ("'The court has the same power to make equitable division of the property so accumulated as it would have in case of the dissolution of a business partnership.'" [quoting *Werner v. Werner*, 59 Kan. 399, 403, 53 P. 127 (1898)]); *Snodgrass v. Bloomcamp*, 225 Kan. 65, 68, 587 P.2d 316 (1978) (citing *Peterson*); see also K.S.A. 56a-104(a) ("Unless displaced by particular provisions of this act, the principles of law and equity supplement this act."). A court sitting in equity has the discretion to determine what is fair and equitable under the circumstances. *Eaton*, 235 Kan. at 329. So except where an issue is specifically addressed by statute or the partnership agreement, the district court has a great deal of discretion.

As such, we review the district court's actions for an abuse of discretion. *Eaton*, 235 Kan. at 329; *Scarrow v. Johnson*, No. 100,262, 2009 WL 5206230, at *4-5 (Kan. App. 2009) (unpublished opinion); see *Mangus v. Stump*, 45 Kan. App. 2d 987, 999, 260 P.3d 1210 (2011), *rev. denied* 293 Kan. 1107 (2012) (holding that the application of an equitable remedy is subject to an abuse-of-discretion standard of review); see also *Gillespie v. Seymour*, 250 Kan. 123, 143, 823 P.2d 782 (1991) ("Our test on appellate review is not whether the [equitable] remedy fashioned is the best remedy that could have been devised, but whether the remedy so fashioned is erroneous as a matter of law or constitutes a breach of trial court discretion."); *Maras v. Stilinovich*, 268 N.W.2d 541, 544 (Minn. 1978) ("The trial court should exercise its powers to find the most advantageous plan which will not prejudice the rights of either party."). A district court abuses its discretion if its action is based on an error of law or fact or is otherwise arbitrary or unreasonable. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *Scarrow*, 2009 WL 5206230, at *4.

5

In reviewing the district court's legal conclusions to determine whether its ruling was based on a legal error, we independently interpret statutes and contracts without deference to the district court's conclusions. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015) (statutes); *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014) (contracts). In reviewing the district court's findings of fact, we ask whether they are supported by substantial evidence—evidence that a reasonable person might accept as sufficient to support a conclusion. *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014). In reviewing the district court's exercise of discretion, where no factual or legal error has been made, we look to the reasonableness of the district court's decision and reverse only if no reasonable person would agree with the decision. *Cresto v. Cresto*, 302 Kan. 820, 848-49, 358 P.3d 831 (2015).

With these legal standards in mind, we turn to Powell's specific contentions. Because the issues in this case are not easily separated and each party organized his or her brief differently, we have reorganized the issues.

I. *The District Court Correctly Interpreted the Partnership Agreement and the Kansas Revised Uniform Partnership Act and Did Not Abuse Its Discretion When It Approved the Wind-up Plan.*

The parties agree that the December 31, 2001, partnership agreement controls. But where the partnership agreement is silent on a particular issue, the Kansas Revised Uniform Partnership Act governs: "To the extent the partnership agreement does not otherwise provide, this act governs relations among the partners and between partners and the partnership." K.S.A. 56a-103(a).

A. *Capital Accounts*

Powell argues that the court shouldn't have adopted Reddick's proposed wind-up plan because it doesn't follow the partnership agreement's terms on how to dissolve the partnership with regard to the partners' capital accounts. Reddick and Brewer contend that the agreement doesn't include any terms about how to dissolve the partnership and, therefore, that the Kansas Revised Uniform Partnership Act controls the dissolution.

Paragraph 4 of the partnership agreement covers the partners' capital contributions. Powell relies on a footnote to the listing of each partner's capital contribution; part of the footnote discusses how the partnership will distribute the capital account of a partner who withdraws, dies, or retires:

> "Notwithstanding the amount listed in the current capital accounts for each partner in the Partnership's financial statements prepared by Tom DeBerry, CPA, each partner shall be deemed to have invested the capital set forth in paragraph 4 and shall be entitled to repayment of capital in the amount set forth in paragraph 4 *in the event of withdrawal, death or retirement from the Partnership* by monthly installments of $1,000.00 from Partnership funds until dissolution of the Partnership. If the Partnership is dissolved or terminated prior to repayment in full of the amount owed to any partner *in the event of withdrawal, death or retirement*, then the Partnership's assets shall be liquidated; such partner shall be deemed to own the percentage of firm assets set forth in paragraph 4; and such partner shall be entitled to payment of any remaining amount owed by the Partnership from liquidation of the Partnership's assets based solely on his or her pro rata percentage of ownership set forth in paragraph 4 above in the Partnership's assets. No partner shall be personally liable for such payment from personal assets because repayment of any amount owed is from Partnership assets only." (Emphasis added.)

The first quoted sentence describes how, if a partner withdraws, dies, or retires, he or she will be deemed to have a certain amount of capital, which the partnership will repay at $1,000 per month. The second sentence moves on to how the partnership will make those

monthly payments if it dissolves before the partner who has withdrawn, died, or retired has been fully repaid. The third sentence states that no partner will be personally responsible for "such payment"—in other words, for the specific payments described in this section: those made to repay the still-outstanding capital account of a partner who has withdrawn, died, or retired.

Read as a whole, it's clear that this paragraph deals only with repayment of capital accounts to withdrawn, dead, or retired partners while the partnership continues to operate—this paragraph doesn't say anything about how to handle dissolution or wind-up more generally. Reddick's trial expert supported this reading: Dr. Quirin completed an example wind-up plan for this case and testified that he had reviewed the partnership agreement and had determined that it didn't include terms about how to dissolve and wind up the partnership.

Powell's brief selectively quotes from this footnote in the agreement to argue that it governs how to repay partners' capital accounts after dissolution, not just in the specific circumstance of a partner's withdrawal, death, or retirement while the partnership is operating and *before* partnership dissolution. In Powell's view, the footnote is one of the most important provisions of the partnership agreement and has major consequences—providing specific provisions for dissolution to govern in lieu of those found in the Kansas Revised Uniform Partnership Act. We think it unlikely that the parties intended this footnote to bear so large a meaning.

Similar rules guide court interpretation of statutes and contracts. See Scalia & Garner, Reading Law 42 (2012). In the case of statutes, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001). Here, the parties did not hide an elephant—a fundamental provision governing dissolution—in the

mousehole of a footnote. The district court correctly determined that the partnership agreement doesn't contain dissolution or wind-up terms. As such, and as Dr. Quirin testified, the Kansas Revised Uniform Partnership Act governs. K.S.A. 56a-103(a).

Under the Act, when a partnership dissolves and winds up its business, it must first repay any creditors. K.S.A. 56a-807(a). After that, "[e]ach partner is entitled to a settlement of all partnership accounts upon winding up the partnership business." K.S.A. 56a-807(b). If any partner has a negative capital-account balance, he or she must pay into the partnership to bring the balance up to zero. K.S.A. 56a-807(b) ("A partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account . . . ."). If a partner has a positive capital-account balance, he or she receives that balance from the partnership. K.S.A. 56a-807(b) ("The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account.").

Dr. Quirin's report and testimony at trial about how to dissolve and wind up a partnership under the Act was essentially uncontroverted, aside from Powell's repeated but incorrect assertions that the footnote to paragraph 4 of the agreement controlled. Even the partnership's accountant testified that he had only kept the books for the partnership and had no opinion on the appropriate dissolution or wind-up process.

This issue is not as complicated as Powell would like to make it: the agreement is silent on dissolution and wind up; when an agreement is silent, the Act applies; and the Act requires that partners repay negative capital accounts and that the partnership pay out positive capital accounts. So Powell and Brewer must repay their negative balances, and Reddick is owed her positive balance. K.S.A. 56a-807(b). Powell's proposed wind-up plan didn't follow the Act, and Reddick's did, so the district court followed Reddick's proposal.

9

Powell also claims that he is due a "final paycheck" from PB&R. But this argument depends on Powell's faulty premise that under the agreement, partners aren't personally liable for repaying their negative capital accounts.

Powell insists that he earned money representing clients and wasn't paid all of that money. He's correct—his tax forms show more reported income than he actually received. But that doesn't mean the district court needed to award him a paycheck in the wind-up plan. The evidence showed that while Reddick and Brewer each received 100% of their earned fees minus their overhead expenses, Powell didn't receive his paychecks that way. Instead, he received whatever was left after everyone paid in their overhead and the others took out their earned fees. In other words, when PB&R's revenue wasn't all spent on overhead costs and paychecks, Powell received the excess, but when revenue was insufficient, Powell bore the loss. In return, Powell's capital account increased by the amount of the loss because his loss was PB&R's benefit.

For example, Powell's K-1 tax form for 2012 stated that he had income of $106,000 but had only actually received $68,967 in cash—the $37,247 that he wasn't paid went toward increasing his capital-account balance. It was in negative territory, but it improved from $-61,338 to $-24,091, a difference of $37,247. The capital-account transaction gave Powell the benefit of his paycheck, so he can't now claim that he's still owed a paycheck.

B. *Advanced Expenses*

Next, Powell claims that the partnership agreement required partners to pay advanced client expenses out of personal funds, not partnership funds, and that Reddick in particular didn't follow this provision and owes money back to PB&R as a result.

10

"Advanced client expenses" are expenses like court filing fees that attorneys pay in advance for their clients; the attorney then bills the client, and the client repays those advanced expenses. Paragraph 9 of the partnership agreement explains how PB&R handles advanced client expenses. It says that partners are personally responsible for their advanced client expenses and that partnership money can't be used for those advances. But trial testimony established that no one at PB&R followed these terms.

Dawn Powell, who did the partnership's in-house bookkeeping, testified plainly that PB&R's standard practice was the opposite of what the agreement said: the firm advanced client expenses and was reimbursed when the client paid the bill—partners were not personally responsible for advancing client expenses. If the client failed to pay, which happened with some regularity, the firm would write off those advanced expenses as uncollectible losses. PB&R's accountant testified to these write-offs: at the end of each year, Powell would tell him how much of the uncollected advanced expenses to write off as a loss.

From this testimony, it's clear that the partnership never followed the agreement on this issue—Powell himself told the accountant how much of the unreimbursed advanced expenses to write off as a loss each year, so he was clearly aware that the firm was advancing client expenses, rather than the partners individually doing so. Powell now seeks to change this standard practice—in dissolution proceedings, for only one partner, Reddick. Powell is correct that courts generally will enforce contracts according to their terms. *Loscher v. Hudson*, 39 Kan. App. 2d 417, Syl. ¶ 6, 182 P.3d 25, *rev. denied* 286 Kan. 1178 (2008). But here, Powell knew that the partners weren't following the agreement, and, based on our record, did not try to enforce the agreement by making partners personally pay for advanced client expenses at any point before these contentious dissolution proceedings.

In these circumstances, the district court did not err when it refused Powell's request to enforce paragraph 9 of the partnership agreement against Reddick. The court was acting in equity, and Powell didn't show that it would be equitable to enforce this provision on dissolution when the partnership had never followed it while it was doing business.

The principle here is much the same as equitable estoppel, which prevents one party from enforcing a contract against another. See *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 116, 991 P.2d 889 (1999). Under this concept, a party "'must show that another party . . . induced it to believe certain facts existed. [The party] must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.'" 268 Kan. at 116 (quoting *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 527, 561 P.2d 792 [1977]).

In our case, the standard partnership practice was to use partnership funds to advance client expenses, and Powell—the managing partner—knew about and participated in that practice. So Reddick used partnership funds for advanced client expenses, reasonably relying on the way Powell had been managing these expenses for years. She did admit that in the months before dissolution, she withheld from PB&R some of the advanced expenses that her clients had reimbursed—her wind-up plan provides that she will repay PB&R those reimbursed funds. But if Powell could enforce the partnership agreement against Reddick at this point, she would also owe PB&R for the advanced client expenses that her clients never reimbursed, in direct opposition to the way PB&R had always handled advanced client expenses. While the district court did not use the phrase "equitable estoppel," it determined that the most equitable result was to follow PB&R's standard practice and for Reddick to pay back only the advanced client expenses that her clients actually reimbursed. We find no error in this use of the district court's equitable powers to supervise a partnership dissolution.

12

C. *The Intrust Bank Loan*

Powell argues that the district court incorrectly determined that the loan from Intrust Bank was his personal responsibility, not the partnership's, as of the date of dissolution, June 30, 2012.

Paragraph 3 of the partnership agreement states that Powell is individually responsible for the loan. The provision includes reference to some partners who had withdrawn before dissolution, and it also notes initially that Powell *and* Brewer are liable to the bank on the loan. But the agreement also provides that Powell will indemnify Brewer with respect to note payments, which effectively made Powell solely responsible for the payments:

> "Powell and Brewer agree that payment of the Intrust Bank Note ('Note') is their individual responsibility with Intrust Bank. The balance of the Note has been reduced from approximately $39,000.00 in January 2000 to $13,957.91 as of September 30, 2001. Powell and Brewer agree to indemnify and hold Gough, Withers, Reddick and Pike harmless with respect to payment of the Note. Powell agrees to indemnify and hold Brewer harmless on the Note. Powell and Brewer agree that the capital contribution made by Gough and Pike shall not be used to pay off the Note. The parties anticipate that the capital contributions made by Gough, Withers, Reddick and Pike and the overhead payments collected by the Partnership will enable the Partnership to refrain from further borrowing under the Note. The Partnership agrees that Powell will continue to pay down the Note in regular monthly payments from overhead revenues received by the Partnership or, if such overhead revenues are inadequate, from funds available to Powell as draws or from his personal assets. Powell will endeavor to pay $500.00 a month as provided above on the Note to gradually retire this indebtedness."

Although the paragraph made Powell responsible for paying the loan, it also said that Powell could use the partnership's *overhead* revenues to make loan payments. As we

13

have discussed, Powell made estimates of overhead expenses, and other partners paid overhead based on those estimates. If there was money left over, Powell got to keep it, so it's not necessarily inconsistent to say that Powell could use the overhead revenues (which would go to him after expenses were paid, anyway), to pay down part of the bank loan. Dr. Quirin, the expert accountant, handled this issue by making repayment of the loan entirely Powell's responsibility as of the date of dissolution, but he treated the loan as a partnership debt and credited Powell's capital account for the amount of the loan.

No one disputes that Powell could make loan payments from overhead revenue while PB&R was still in business. The loan documentation listed PB&R as the borrower. As managing partner, it was Powell's responsibility to set overhead costs for the partners and the firm's other lawyers. Powell's yearly budgets included loan payments as part of the calculation of how much overhead each partner and of-counsel would owe per month, and no one disputes that Powell then used PB&R's overhead revenue to make those monthly loan payments. And according to Powell, the purpose of the loan was to cover various shortages in PB&R's account, including those caused by unreimbursed advanced client expenses.

On the other hand, as of December 31, 2001, the date of the partnership agreement, the parties specifically anticipated that no further borrowing would be necessary and that the loan would be paid off in the near future. The partnership agreement also said that Powell, as managing partner, wasn't authorized to obligate the partnership on new lending arrangements without approval from a majority of the partners. But that's not what happened, as trial testimony and exhibits established. The agreement lists a loan balance of $13,957.91 on September 30, 2001, but the evidence showed that before the agreement was signed and apparently without notice to the other partners, Powell had already borrowed another $15,000 on the loan. And despite Powell's regular payments, he continued borrowing money without approval by or consultation with the other partners—over $77,500 from 2002 to 2011. At least once, he specifically

14

refused to allow Brewer to borrow money on the loan. This evidence strongly indicates that Powell treated the loan as his own, although he did insist that it was always for partnership business.

The specific issue here is whether Powell could continue making loan payments from "overhead revenue" even after the partnership dissolved. When the firm dissolved on June 30, 2012, the loan balance was $33,394.88, and some attorneys in PB&R's office still owed the firm past-due overhead. Powell argues that as the partnership has been collecting past-due overhead revenue, he's been using it to make loan payments. Reddick and Brewer contend that Powell became individually responsible for the loan on the date of dissolution, and Reddick's wind-up plan requires Powell to repay PB&R for those post-dissolution loan payments.

The trial court ruled that the loan was Powell's sole responsibility as of the date of dissolution and wasn't a partnership debt, and Reddick's wind-up plan followed that ruling: it required Powell to repay PB&R for the post-dissolution loan payments and didn't credit Powell's capital account for paying off the loan. The ruling was supported by the evidence that Powell was supposed to start paying off the loan in 2001 and get approval for any continued borrowing but instead treated the loan as a personal line of credit and routinely borrowed money without consulting the other partners, as the partnership agreement required.

We note once again that the district court was acting in equity here, and we review its decision for abuse of discretion. Neither the partnership agreement nor the Kansas Revised Uniform Partnership Act specifically addressed the issue presented. Had Powell not borrowed beyond the amount addressed in the parties' agreement, the loan would have been paid off by dissolution. That the partnership was still collecting past-due overhead, which Powell had been allowed to use for loan payments, doesn't substantially undermine the district court's ruling: Powell was managing partner, and it was his

15

responsibility to set and collect overhead, so Powell was doubly responsible if the overhead wasn't adequate to pay off the loan or wasn't paid on time. He was responsible for setting adequate overhead, and he was responsible for personally paying the loan if the overhead wasn't adequate. Powell's continued borrowing through this loan over the years suggests that the overhead was never adequate. While the court might well have been within its equitable authority to allow Powell to use past-due overhead payments made after dissolution to pay down the loan, we find no abuse of discretion in its refusal to do so. The district court did not err when it ruled that the loan was Powell's individual responsibility.

D. *Other Payments Owed to PB&R*

Powell spends a substantial amount of time in his brief discussing what he calls "damages." This is confusing because there are no "damages" in this case—there's just a partnership wind-up and the accounting that goes with it. "Damages" is "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary 471 (10th ed. 2014). Other than PB&R's business losses and despite everyone's hurt feelings, there's no legal "loss or injury" in this case. The monetary amounts due to or from the parties are based on accounting for the partnership's assets and losses, not on any loss or injury to the partners as individuals. The district court specifically excluded any claims for breach of fiduciary duties from this case, and despite the parties' allegations of various breaches of the partnership agreement, no breach-of-contract claims were actually made in this case. Any money that Powell, Reddick, or Brewer may owe, they owe to PB&R, based on generally accepted accounting principles that were explained at trial and not contested.

What Powell actually challenges here are the court's conclusions about which of the post-dissolution partnership expenses were legitimately related to winding up the business and which weren't, because he has to pay the partnership back for expenses that

16

shouldn't have been paid with partnership funds in the first place. The final wind-up plan states that Powell owes the partnership $16,834.17 for illegitimate wind-up expenses. Some of that comes from Powell's post-dissolution loan payments, which the district court ruled were Powell's individual responsibility, as discussed above. At trial, the parties presented evidence and bank records regarding the other post-dissolution transactions—some legitimate and some not—in the partnership's operating account, transactions that included charges for accountant fees, computer supplies, phone service, and legal-research services, as well as deposits for past-due overhead, postage reimbursement, and purchases of partnership furniture.

We do not weigh evidence and will not rehash the arguments about each of these items. *Gannon*, 298 Kan. at 1175. Simply put, each side presented evidence related to the post-dissolution expenses, and the district court was within its rights as a trial court—particularly one sitting in equity—to choose the most persuasive evidence.

Powell presented evidence that attempted to explain the many post-dissolution charges and deposits on the PB&R operating account. For example, he argued that a charge to Chase Bank was PB&R paying Powell and his wife back after his wife used her personal credit card to purchase phones for the partnership. But the district court determined that Powell was in charge of setting overhead for the attorneys at PB&R—overhead that should have covered underlying business expenses like phones. PB&R's inability to pay for these items (resulting in Powell's wife's credit-card purchase) was directly caused by Powell's own management choices in setting overhead; the district court was within its discretionary authority to determine that Powell could not—after dissolution—push these costs, item by individual item, onto Brewer and Reddick by calling them wind-up expenses.

Powell similarly argues that Reddick wrongly calculated her own "damages"—his term for the amounts she personally owed back to PB&R for overhead and advanced

17

client expenses. The court-approved wind-up plan states that Reddick owes the firm $14,557.94 for these items. Similar amounts were assessed against Brewer, and the court separately determined what other expenses were properly charged to the firm or not. For ones that were not proper expenses, such as loan payments, the court ordered that Powell reimburse the partnership for those amounts. After those repayments, the partnership's cash account will have a positive balance to be split among the partners according to their capital percentages.

Powell instead argues that Reddick should have to pay in 23% (her capital percentage) of each of the legitimate wind-up expenses. Following that logic, Powell and Brewer would also have to pay in their capital percentages toward the same expenses. These payments would increase the balance of PB&R's operating account—and the account balance would then be divided among the partners by their capital percentages—so they would immediately receive back what they paid in. The district court didn't abuse its discretion by declining this option and instead simply determining which of the wind-up expenses were legitimate and which weren't, with corresponding payments to reimburse the partnership for expenses that shouldn't have been paid from partnership funds.

E. *In-Kind Disbursements*

Powell also challenges the district court's ruling that the partners have already equitably divided the partnership's physical assets, including furniture, electronics, and office supplies. The agreement is silent on this issue except to note that some partners owned their personal office furniture, books, and computers.

Because the agreement doesn't cover this issue, Powell claims that the Act applies and bars in-kind distributions, that is, payments made in the form of property rather than cash. Powell cites to K.S.A. 56a-402, which provides: "A partner has no right to receive,

and may not be required to accept, a distribution in kind." Reddick and Brewer argue that this provision doesn't apply when a partnership is dissolving—K.S.A. 56a-402 is found in Article 4 of the Kansas Revised Uniform Partnership Act, which applies to the relations of partners to each other and the partnership, while other provisions, found in Article 8, K.S.A. 56a-801 to -807, govern dissolution.

We conclude that we need not decide this particular statutory issue (one that hasn't ever been discussed in a Kansas appellate court opinion). As we have explained throughout our opinion, the district court supervised this dissolution using its equitable powers. While it might have ordered all property sold and divided the cash proceeds, we find no abuse of discretion in its decision to allow the property taken by each partner at dissolution to remain where it went. Despite some disagreement, the partners did divide the physical assets among themselves at the time of dissolution.

Substantial evidence supports the district court's conclusion that the way the physical property was divided was "in kind and equitable," meaning that its division in this manner still gave each partner appropriate value for the property. The total value of the partnership's physical assets was estimated to be only $4,517—the number used on the partnership's tax returns and in Quirin's expert report. According to Powell, the estimated value of the items that he wants Reddick and Brewer to return is $2,010. So two partners, whose capital percentage together is 61.5%, have less than half of the assets. In the meantime, Powell, whose capital percentage is 38.5%, has retained the rest of the partnership property, including billing and accounting software and more furniture than fits in his current office.

Powell argues, based on K.S.A. 56a-402, that he cannot be forced to accept the furniture he's kept as an in-kind distribution and that Reddick and Brewer have no right to this in-kind distribution. But even if we were to rule that this in-kind distribution violated the Act, then all the physical assets would have to be sold and the proceeds divided

19

among the partners. That result wouldn't be substantially different from where the parties are now. So, in these circumstances, the district court, sitting in equity, didn't abuse its discretion when it concluded that the physical assets had already been fairly divided.

II. *The District Court's Appointment of Reddick as the Partner in Charge of Wind-Up Was Equitable.*

Powell also challenges the district court's appointment of Reddick as the partner in charge of wind-up. In doing so, he makes a variety of breach-of-contract and breach-of-fiduciary claims against Reddick. But Powell's petition only asked the district court to supervise the dissolution—he didn't bring any breach claims against Reddick. And the district court expressly excluded such claims from this litigation (a ruling not contested on appeal). As such, we won't address the breach claims.

Powell refers to himself in his brief as "the only remaining partner" of PB&R. This is misleading and inaccurate. A partnership by definition has more than one partner, so he can't be the only partner left. K.S.A. 56a-101(f) ("'Partnership' means an association of two or more persons to carry on as co-owners a business for profit."). Furthermore, everyone agrees that PB&R dissolved on June 30, 2012. After dissolution, a partnership exists for only one reason: to wind up its remaining business. K.S.A. 56a-802(a) ("[A] partnership continues after dissolution only for the purpose of winding up its business."). So PB&R stills exists, but only to wind up its business. And "a partner who has not wrongfully dissociated may participate in winding up the partnership's business." K.S.A. 56a-803(a). Despite his many allegations against Reddick, Powell hasn't ever claimed that she "wrongfully dissociated," so from a statutory perspective, Reddick is qualified to wind up PB&R's business.

On the discretionary question the district court faced of whom to appoint to be in charge of the wind-up, it's true that Reddick's actions toward the partnership weren't

always proper in its final months of operation. She admitted to withholding some partnership money and drawing her last few paychecks differently than usual (without first depositing her receipts in PB&R's operating account) in the months leading up to the dissolution. But her wind-up plan indicates that she will pay back the overhead and reimbursed advanced expenses that she withheld and that belong to PB&R, and the district court specifically noted that she likely withheld this money out of frustration rather than any bad motive.

None of Powell's other allegations about Reddick's fitness have any merit or support. The case he cites to support his claims against Reddick, *In re Schnittker*, 298 Kan. 89, 310 P.3d 399 (2013), actually works in Reddick's favor. First, *Schnittker* is a disciplinary case, and the record in this case shows that the disciplinary committee declined to address Powell's complaint against Reddick. Second, Schnittker took over $150,000 from his partnership, including funds belonging to another partner, and deposited it into a personal account, all of which amounted to felony theft. *Schnittker*, 298 Kan. at 90, 93. Here, Reddick merely deposited her own fees into her own business account rather than into PB&R's operating account, and the final wind-up plan accounts for the money she owes to PB&R. The enormous difference between Schnittker's behavior and Reddick's demonstrates how minor Reddick's improper actions were. The district court's finding that, overall, Reddick has conducted herself responsibly was supported by substantial evidence in the record.

The district court had to choose someone to wind up the partnership's business, and it was reasonable for the court not to trust Powell with that task: at the time of trial, 2 years after dissolution, wind-up was still ongoing. And it became clear during and after trial that Powell's wind-up plan would never follow the applicable statutes and account for the partners' capital accounts. The district court didn't abuse its discretion when it appointed Reddick to wind up the business.

21

III. *The District Court Independently Analyzed Powell's Claims and Did Not Abuse Its Discretion When It Denied Powell's Motion for a New Trial.*

Finally, Powell argues that the district court did not independently consider his claims and should have granted him a new trial because he didn't have a reasonable opportunity to present evidence against Reddick's proposed wind-up plan.

Powell's first assertion, that the court adopted Reddick's wind-up plan without independently analyzing its accuracy or considering Powell's arguments against it, is easily disproved by the court record. After a 4-day trial, the district court requested proposed wind-up plans from each party and held a hearing at which the parties each argued for their plans. At that hearing, the district court specifically asked Powell to compare his plan to Reddick's. It's clear from the court's comments from the bench, particularly at the second hearing, that it had a full understanding of the facts and law in this case. Also, the detail with which the court adjusted Reddick's wind-up proposal further demonstrates its independent analysis of the case. Powell's insistence on a line-by-line refutation of his proposed wind-up plan is misplaced—the court understood and analyzed the case as a whole, and Powell's proposed plan, which attempted to recoup expenses going back to 2010 and didn't account for the partners' capital accounts, was deeply flawed.

Powell's contentions regarding the "risk of self-interest" and "risk of bias" in using Reddick's plan are similarly misplaced. He again frames the discussion in terms of "damages," which is inaccurate in the context of partnership dissolution. Reddick didn't "decide the amount of damages"—she proposed how to wind up the partnership, as the district court had asked. Powell also claims Reddick and Brewer were "acting in concert," but if Reddick and Brewer agreed with each other and not with Powell, that's not inherently unfair to Powell. In litigation, each side advocates for what it wants—that's the

whole point. Any risk of self-interest or bias in Reddick's plan was eliminated by the court's involvement and supervision, which is what Powell asked for in the first place.

As to Powell's motion for a new trial, the district court has discretion to grant or deny a new trial under K.S.A. 2015 Supp. 60-259(a), so we won't disturb the denial of Powell's motion unless the district court abused its discretion. *Miller v. Johnson*, 295 Kan. 636, 684-85, 289 P.3d 1098 (2012).

There was nothing unreasonable about the district court's denial of Powell's motion for a new trial. Reddick's proposed wind-up plan was based on the evidence presented at the 4-day trial by witnesses and in hundreds of exhibits. Her version of the accounting procedures for partnership wind-up (modified by the court) resulted in Powell owing the partnership $16,834; Powell's version did not. The different results do not stem from Reddick improperly "altering" or "omitting" figures or presenting any "new claims" but from Powell's insistence on trying to recoup expenses going back to 2010, his belief that the Intrust loan was a partnership debt, and his refusal to account for the partners' capital accounts. Each of the issues that Powell wants to examine at the new trial are issues that this trial already covered: which post-dissolution expenses were legitimate, what Reddick owes back to PB&R, what Brewer owes back to PB&R, how to handle the partners' capital accounts and Powell's "final paycheck," and who is responsible for the Intrust loan. Powell wasn't unfairly surprised by Reddick's plan, nor was he deprived of a chance to present evidence.

Powell has not shown that the district court misinterpreted the partnership agreement or the Kansas Revised Uniform Partnership Act. We find no abuse of its discretion when it approved Reddick's wind-up plan, as modified, and denied Powell's motion for a new trial.

We affirm the district court's judgment.