No. 102,630

PRAIRIE LAND ELECTRIC COOPERATIVE, INC., A Kansas Electric Cooperative, *Plaintiff/Appellee*, v. KANSAS ELECTRIC POWER COOPERATIVE, INC., *Defendant/Appellant*, and SUNFLOWER ELECTRIC POWER CORPORATION, *Defendant/Appellee*.

(323 P.3d 1270)

Opinion filed May 16, 2014.

*Timothy J. Sear*, of Polsinelli Shughart PC, of Overland Park, argued the cause, and *Kevin J. Breer* and *Brett C. Randol*, of the same firm, and *R. Douglas Sebelius*, of Sebelius and Griffiths, LLP, of Norton, were with him on the briefs for defendant/appellant Kansas Electric Power Cooperative, Inc.

*John F. McClymont*, of Ryan, Walter & McClymont, Chtd., of Norton, argued the cause and was on the briefs for plaintiff/appellee Prairie Land Electric Cooperative, Inc.

*James M. McVay*, of Watkins Calcara, Chtd, of Great Bend, argued the cause and was on the briefs for defendant/appellee Sunflower Electric Power Corporation.

The opinion of the court was delivered by

MORITZ, J.: We granted review in this declaratory judgment action to consider a unique contract question involving three parties, one of which entered into two separate "all-requirements" contracts, agreeing to purchase all of its wholesale electricity needs from each of the other two parties. The district court ruled in favor

of the supplier that entered into the first all-requirements contract, and the Court of Appeals reversed the district court.

Simply stated, the parties have presented the court with two seemingly irreconcilable contracts. Nevertheless, we are not asked to determine whether any party breached its obligations under either contract, but to consider which party has superior rights under the competing contracts. We conclude that under the facts of this case, the party that chose to enter into two temporally overlapping all-requirements contracts must meet its obligations under its contract with the first supplier before it may comply with any obligations under its contract with the second supplier. Consequently, we reverse the Court of Appeals' decision and affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Prairie Land Electric Cooperative, Inc. (Prairie Land) purchases wholesale electricity from multiple suppliers and distributes that electricity to retail consumers within a certified service area in northwest and north central Kansas. The Kansas Corporation Commission establishes the boundaries of Prairie Land's certified service area. Within its certified service area, Prairie Land's distribution system consists of all the "facilities, transmission lines, distribution lines and substation equipment as owned and operated by Prairie Land." The dispute in this case arises from Prairie Land's decision to enter into temporally overlapping, long-term all-requirements contracts with two different wholesale electricity suppliers.

### *The Sunflower Contract*

Nearly 50 years before the current litigation arose, Prairie Land entered into an all-requirements contract with Sunflower Electric Power Corporation (Sunflower). The Sunflower Contract, entered into in February 1958, remains in effect until April 2021 and in relevant part provides:

"1. General. [Sunflower] shall sell and deliver to [Prairie Land] and *[Prairie Land] shall purchase and receive from [Sunflower] all electric power and energy which [Prairie Land] shall require for the operation of [Prairie Land's] system* to the extent that [Sunflower] shall have such power and energy available, provided, however, that [Prairie Land] shall have the right to continue to purchase electric

power and energy under any existing contract or contracts with a supplier other than [Sunflower] during the remainder of the term thereof. [Prairie Land] shall terminate, if [Sunflower] shall, with the approval or at the direction of the Administrator of the Rural Electrification Administration (hereinafter called the 'Administrator'), so request, any such existing contract or contracts with a supplier other than [Sunflower] at such times as it may legally do so, provided [Sunflower] shall have sufficient electric power and energy available for [Prairie Land]." (Emphasis added.)

In a letter dated June 1958, Sunflower acknowledged that Prairie Land continued to purchase some of its energy requirements from the Western Light and Telephone Company (Centel). In the letter, Sunflower advised Prairie Land it was "agreeable . . . to permitting [Prairie Land] to continue purchasing some of its electric power and energy requirements from [Centel], solely for the purpose of supplying the power and energy requirements of those portions of your distribution system which are presently being served by [Centel]." Sunflower later agreed to permit Prairie Land to purchase power from Centel to serve a new delivery point in Rooks County. In doing so, Sunflower advised Prairie Land that Sunflower did not have the capacity to provide power to that particular delivery point.

*The KEPCo Contract*

In September 1977, Prairie Land entered into a second all-requirements contract with Kansas Electric Power Cooperative, Inc. (KEPCo). The KEPCo Contract remains in effect until December 31, 2020, and in relevant part after its August 16, 1978, amendment, provides:

"1. General. [KEPCo] shall sell and deliver to [Prairie Land] and *[Prairie Land] shall purchase and receive from [KEPCo] all electric power and energy which [Prairie Land] shall require for the operation of [Prairie Land's] system* to the extent that [KEPCo] shall have such power and energy and facilities available; provided, however, that [Prairie Land] shall continue to purchase electric power and energy under any existing contract or contracts with a supplier other than [KEPCo] during the remainder of the term thereof. [Prairie Land] shall terminate, if [KEPCo] shall, with the approval or at the direction of the Administrator of the Rural Electrification Administration (hereinafter called the 'Administrator'), so request, any such existing contract or contracts with a supplier other than [KEPCo] at such times as it may legally do so, provided [KEPCo] shall have

sufficient electric power and energy and facilities available for [Prairie Land]. Provided, however, that [Prairie Land] may continue to utilize power and energy generated from those facilities owned by [Prairie Land] at the time of [Prairie Land's] execution of the [KEPCo] Wholesale Power Contract, and provided further, that in the event of an emergency power outage(s) which affects a member system during the term of [the KEPCo Contract] [Prairie Land] may take power and energy from a power supplier(s) other than [KEPCo] on an emergency, short term basis." (Emphasis added.)

With this general language, the KEPCo Contract recognized Prairie Land's right to continue to purchase electric power and energy under Prairie Land's "existing contract" with Sunflower and did not attempt to limit the geographic scope of that preexisting contract or its future impact. Notably, as discussed, Prairie Land's preexisting contract with Sunflower obligated Prairie Land to purchase *all* of the requirements for Prairie Land's "system" from Sunflower. But inexplicably, in paragraph 6(b) of the KEPCo Contract, KEPCo sought to temporally and geographically limit Prairie Land's obligation to Sunflower to "those areas of [Prairie Land's] system presently served" with power procured from Sunflower:

"If [Prairie Land] is presently a member of Sunflower Electric Cooperative, Inc. (hereinafter called 'Sunflower') and intends to retain its membership in Sunflower and to continue to procure from Sunflower its power requirements *for those areas of its system presently served with power procured from Sunflower*, [Prairie Land] and [KEPCo] agree that all of [Prairie Land's] power requirements to serve those areas of [Prairie Land's] system other than those served with power procured from Sunflower at the time of execution of this contract, shall be furnished to [Prairie Land] by [KEPCo] pursuant to this Wholesale Power Contract." (Emphasis added.)

In summary, the Sunflower Contract required Prairie Land to purchase all of the present and future power needs for Prairie Land's "system" from Sunflower unless Sunflower could not supply such needs or Prairie Land had a preexisting contract or contracts with a supplier other than Sunflower. Likewise, Prairie Land's subsequent contract with KEPCo generally required Prairie Land to purchase all of the present and future power needs for Prairie Land's "system" from KEPCo unless KEPCo could not meet Prairie Land's needs or Prairie Land had a preexisting contract or contracts with a supplier other than KEPCo. But paragraph 6(b) of

the KEPCo Contract then purported to qualify this more general language by limiting Prairie Land's future obligations to one particular supplier—Sunflower—to "those areas of [Prairie Land's] system presently served with power procured from Sunflower," although Sunflower was not a party to the KEPCo Contract.

*The Delivery Point of Contention*

In 2005, Jayhawk Pipeline Service (Jayhawk), a new retail customer, informed Prairie Land it would need electric service to operate an oil-pumping station on a 500-horsepower motor. Because the pumping station would be built near Prairie Land's Phillipsburg substation—a substation supplied with wholesale electricity from KEPCo—Prairie Land contacted KEPCo about the possibility of adding the new customer load to the Phillipsburg substation.

Prairie Land later learned the Jayhawk pumping station would utilize a 1,250-horsepower motor and the load for this new station would exceed the Phillipsburg substation's capacity. After considering several factors, including its preexisting all-requirements contract with Sunflower, Prairie Land decided to establish a new delivery point and substation to serve the Jayhawk pumping station, and to purchase wholesale electricity for the new delivery point from Sunflower rather than KEPCo.

In correspondence dated November 9, 2007, KEPCo advised Prairie Land that the KEPCo Contract required Prairie Land to purchase power from KEPCo to serve the new load created by the Jayhawk pumping station.

*District Court Proceedings*

On November 16, 2007, Prairie Land filed a petition for declaratory judgment in Phillips County District Court pursuant to K.S.A. 60-1701 *et seq.*, asking the court "to construe and declare the rights, status and legal relations of the parties" under the Sunflower and KEPCo Contracts.

Following a 2-day bench trial, the district court issued a comprehensive memorandum decision and order, ultimately concluding "Sunflower has the contractual right and obligation to serve the new Jayhawk pumping station delivery point." In reaching this conclusion, the district court found ambiguities in the KEPCo Con-

tract, particularly KEPCo's recognition of Prairie Land's existing contractual obligations to Sunflower and its attempt to limit those obligations in paragraph 6(b), KEPCo's use of the undefined term "areas" in that same provision, and KEPCo's failure to clarify the scope of paragraph 6(b).

Additionally, while the district court characterized both the KEPCo and Sunflower Contracts as "all-requirements" contracts, it noted that the Sunflower Contract was "first in time" and that KEPCo knew of Prairie Land's preexisting contractual obligations with Sunflower when KEPCo drafted the KEPCo Contract. Finally, the district court determined neither Sunflower nor Prairie Land had waived "their respective rights and obligations under" the Sunflower Contract. In sum, the district court determined Sunflower had the right to supply the need created by the Jayhawk pumping station.

*Court of Appeals' Decision*

In its direct appeal to the Court of Appeals, KEPCo argued the district court erred in concluding that paragraph 6(b) of the KEPCo Contract was ambiguous and in finding Sunflower had not waived or released its contractual right to serve the new delivery point. In response, Sunflower and Prairie Land asserted, in part, that Sunflower was entitled to serve the new delivery point because the Sunflower Contract was prior in time.

Ultimately, the panel reversed the district court's ruling and remanded with directions to enter judgment in favor of KEPCo after concluding KEPCo had the contractual right to supply electricity to Prairie Land for the new delivery point based on the unambiguous language of the KEPCo Contract. *Prairie Land Elec. Co-op. v. Kansas Elec. Power Co-op*, No. 102,630, 2010 WL 4977115, at *8 (Kan. App. 2010) (unpublished opinion), *rev. granted* 293 Kan. 1107 (2011).

After rejecting Sunflower's "prior in time" argument on procedural grounds, the panel focused solely on the language of the KEPCo Contract and agreed with KEPCo that the term "areas" in paragraph 6(b) of the KEPCo Contract was unambiguous. 2010 WL 4977115, at *4-8. Ultimately, the panel determined the parties

to the KEPCo Contract intended the term "areas" to be "geographical in scope" and concluded the Jayhawk pumping station was "undoubtedly within the area served by the Phillipsburg delivery point, so the power must come from KEPCo as a matter of contract." 2010 WL 4977115, at *6, 8. Finally, the panel found the waiver issue moot "given the rights granted by the KEPCo contract." 2010 WL 4977115, at *8. We granted Sunflower's and Prairie Land's petitions seeking review of the Court of Appeals' decision under K.S.A. 20-3018(b), obtaining jurisdiction under K.S.A. 60-2101(b).

## DISCUSSION

Preliminarily, we note that our summaries of the district court's and the Court of Appeals panel's findings and conclusions are highly condensed. This is so because we exercise unlimited review over the interpretation and legal effect of written instruments, and we are not bound by the lower courts' interpretations of those instruments. See *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011); *McGinley v. Bank of America, N.A.*, 279 Kan. 426, 431, 109 P.3d 1146 (2005).

So we begin anew, keeping in mind "[t]he primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007).

We find it helpful initially to place this action in the appropriate context by clarifying what it is not—*i.e.*, this is not a breach of contract action brought by KEPCo against Prairie Land to enforce its rights under the KEPCo Contract. Rather, this is a declaratory judgment action. Declaratory judgment actions " 'provide relief from uncertainty and insecurity' with respect to 'rights, status and other legal relations.' " *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013) (quoting K.S.A. 60-1713).

In the spirit of a declaratory judgment, Prairie Land brought this action to "construe and declare the rights, status and other legal

relations of the parties" under the nearly identical portions of *both* its 1958 all-requirements contract with Sunflower and its 1977 all-requirements contract with KEPCo. In its declaratory judgment petition, Prairie Land identified the pending dispute concerning the Jayhawk pumping station and informed the court that KEPCo had threatened to sue Prairie Land if Prairie Land refused to permit KEPCo to serve the load. Finally, Prairie Land asserted that its preexisting all-requirements contract with Sunflower required Prairie Land to purchase the power for the new pumping station from Sunflower and that the KEPCo Contract recognized this pre-existing obligation.

Although the declaratory judgment action clearly placed both contracts at issue and sought the district court's determination of the "rights, status and other legal relations of the parties" under both agreements, the Court of Appeals panel initially discarded any consideration of the Sunflower Contract, observing simply:

"Sunflower argues it 'has the contractual right to serve the new Jayhawk delivery point' because its contract 'was prior in time to the KEPCo contract.' This is contrary, however, to the trial court's ruling. The trial court gave Sunflower the right because Prairie Land had not chosen KEPCo, not because Sunflower enjoyed a precedence over KEPCo. Absent a cross-appeal, we will not consider points contrary to the trial court's ruling." *Prairie Land*, 2010 WL 4977115, at °4.

Unlike the panel, we will not resolve the question presented in this declaratory judgment action by ignoring one of the two contracts at issue. First, although not determinative, we note that the trial court did not ignore the Sunflower Contract. Instead, it found the Sunflower Contract was "first in time" and further concluded neither Sunflower nor Prairie Land had waived their respective rights and obligations under that contract. Second, even if the district court had considered only the KEPCo Contract, the panel was not precluded from considering both contracts. Rather, as we have noted, an appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower courts' interpretations of those instruments.

With that context in mind, we proceed to first consider the Sunflower Contract, which, as Prairie Land noted, was executed nearly 20 years prior to the KEPCo Contract. Notably, under the plain

and unambiguous language of the Sunflower Contract, Prairie Land agreed to "purchase and receive from [Sunflower] *all electric power and energy which [Prairie Land] shall require for the operation of [Prairie Land's] system.*" The parties agreed to only two exceptions to this all-requirements language: (1) if Sunflower lacked capacity to meet all of Prairie Land's requirements; or (2) if Prairie Land had preexisting obligations to purchase some of its energy requirements from other suppliers at the time it entered into the Sunflower Contract.

Both of these exceptions came into play shortly after Prairie Land entered into the Sunflower Contract when, by letter agreement, Sunflower acknowledged Prairie Land's preexisting agreement to purchase some of its energy requirements from Centel and permitted Prairie Land to continue doing so, and when Sunflower permitted Prairie Land to purchase power from Centel for a new delivery point which Sunflower lacked the capacity to supply.

Accordingly, until 1977, Prairie Land purchased all of its energy requirements from Sunflower, except the power it required for two delivery points. And Prairie Land purchased power for those two delivery points from Centel in accordance with the exceptions recognized in the Sunflower Contract.

In 1977, Prairie Land entered into the KEPCo Contract. On its face, the KEPCo Contract required Prairie Land to assume the same obligation to KEPCo that Prairie Land had assumed to Sunflower under the Sunflower Contract—*i.e.*, Prairie Land agreed generally to "purchase and receive from [KEPCo] *all electric power and energy which [Prairie Land] shall require for the operation of [Prairie Land's] system.*" To further complicate matters, in paragraph 1 of the KEPCo Contract, Prairie Land purported to agree to the same two exceptions to the all-requirements language which it had agreed to in the Sunflower Contract: (1) if KEPCo lacked the capacity to meet all of Prairie Land's requirements; or (2) if Prairie Land had preexisting obligations to purchase its needs from another supplier.

Despite this general language in the KEPCo Contract recognizing Prairie Land's preexisting obligations to Sunflower, in paragraph 6(b) of that same contract KEPCo inexplicably attempted to

limit Prairie Land's obligations to Sunflower, utilizing language varying from the all-requirements language of Prairie Land's separate contract with Sunflower:

"If [Prairie Land] is presently a member of Sunflower Electric Cooperative, Inc. (hereinafter called 'Sunflower') and intends to retain its membership in Sunflower and to continue to procure from Sunflower its power requirements *for those areas of its system presently served* with power procured from Sunflower, [Prairie Land] and [KEPCo] agree that all of [Prairie Land's] power requirements to serve *those areas of [Prairie Land's] system* other than those served with power procured from Sunflower at the time of execution of this contract, shall be furnished to [Prairie Land] by [KEPCo] pursuant to this Wholesale Power Contract." (Emphasis added.)

In this litigation, Sunflower points out that the Jayhawk pumping station is clearly within Prairie Land's "system" and because neither exception to the all-requirements language of the preexisting Sunflower Contract applies, Prairie Land is contractually required to purchase power for the new pumping station from Sunflower. Prairie Land concurs with this interpretation of the Sunflower Contract.

KEPCo, on the other hand, argues that its identical, but later in time, all-requirements contract with Prairie Land requires Prairie Land to purchase power for the Jayhawk pumping station from KEPCo. But unlike Sunflower, KEPCo does not focus on the all-requirements language of its contract that mirrors the language in the preexisting Sunflower Contract and requires Prairie Land to purchase all requirements for its "system" from KEPCo. Instead, KEPCo focuses on paragraph 6(b) of the KEPCo Contract, which attempts to limit Prairie Land's preexisting obligation to Sunflower by permitting KEPCo to serve *"areas* of [Prairie Land's] system" not presently served by Sunflower.

Notably, none of the parties offers any real solution to the underlying irreconcilable conflict, *i.e.*, that Prairie Land entered into identical and temporally overlapping agreements to purchase *all* of the requirements for its *system* from two different suppliers, yet neither supplier was a party to the other contract.

The Court of Appeals panel essentially ignored this conflict by suggesting that the issue was not properly before it and then moved

on to considering paragraph 6(b) of the KEPCo Contract. But we decline to reconcile this conflict by ignoring it; nor can we reconcile the conflict, as KEPCo suggests, by turning to paragraph 6(b) of the KEPCo Contract. Although in this paragraph Prairie Land and KEPCo purportedly limited the scope of Prairie Land's future obligations to Sunflower under its preexisting all-requirements contract, Sunflower was not a party to the KEPCo Contract and never agreed to limit Prairie Land's future obligation to Sunflower to only those *"areas* of [Prairie Land's] system" served by Sunflower at the time the KEPCo Contract was executed.

Moreover, paragraph 6(b) directly contradicted Prairie Land's broader and preexisting obligation to purchase *all* of the present and future power requirements for the operation of its "system" from Sunflower. Further, paragraph 6(b) of the KEPCo Contract conflicted with paragraph 1 of that same contract, whereby KEPCo agreed that Prairie Land could continue to purchase electric power and energy under any preexisting contracts with other suppliers, including Sunflower.

After careful consideration of these seemingly irreconcilable contract provisions, we conclude the only way to reasonably interpret and give legal effect to both contracts is to interpret the KEPCo Contract in light of, and as limited by, Prairie Land's preexisting obligations under the Sunflower Contract. We thus conclude that Prairie Land agreed in the KEPCo Contract to purchase its needs from KEPCo only if one of the two exceptions recognized in the Sunflower Contract applied—*i.e.*, if Sunflower lacked capacity to meet all of Prairie Land's requirements; or (2) if Prairie Land had preexisting obligations to purchase some of its energy requirements from other suppliers at the time it entered into the Sunflower Contract.

The first exception does not apply here because Sunflower had the capacity to meet Prairie's Land's requirements for the new Jayhawk pumping station. Similarly, the second exception does not apply here because Prairie Land did not have a preexisting obligation to purchase energy requirements for the new Jayhawk pumping station from a supplier other than Sunflower at the time it entered into the Sunflower Contract. Thus, we interpret the con-

tracts at issue to require that Prairie Land purchase its energy needs for the Jayhawk pumping station from Sunflower rather than KEPCo.

Accordingly, we reverse the Court of Appeals' decision and affirm the district court's decision on Prairie Land's petition for declaratory judgment.