NOT DESIGNATED FOR PUBLICATION

No. 114,846

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

ALAN E. SOUTH,
*Appellee*,

and

GRACE ANN STOUT SOUTH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed March 3, 2017. Affirmed in part and remanded with directions.

*T. Bradley Manson*, *Katie McClaflin*, and *Dana L. Fahey*, of Manson Karbank, of Overland Park, for appellant.

*G. Peter Bunn, III*, *Jessica A.B. White*, and *Brett T. Runyon*, of Ferree, Bunn, Rundberg & Ridgway, Chartered, of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

*Per Curiam*:  This is a divorce case involving division of property. Prior to being married in 2009, Alan South and Grace Ann Stout South entered into a valid premarital agreement in Kansas that provided for the disposition of various assets and property if the parties were to divorce. Alan and Grace divorced in 2015. Following a trial, the district court issued a memorandum decision dividing their property and debts.

1

Grace appeals the district court's decision claiming that it wrongly classified the parties' vacation home and certain items of personal property as marital property rather than joint property under the terms of the premarital agreement. Grace also claims that the district court erred in ordering her to reimburse Alan for a portion of the parties' 2014 income tax liability. For the reasons stated herein, we affirm the district court's judgment but remand for the district court to calculate the precise amount of Grace's tax liability.

FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2009, Alan and Grace executed a premarital agreement after each party had retained independent counsel. The premarital agreement created five distinct categories of property and assets: joint property; separate property; marital property; jewelry, clothing and articles of personal adornment; and household goods and furnishings. The agreement also provided for the distribution of these categories of property should Alan and Grace get divorced.

The categories of property pertinent to this appeal are joint property and marital property. The premarital agreement defined joint property as:

"[A]ny property [ ] acquired by the parties, or either of them, and titled with the other party as joint tenants and not tenants in common, and in the event of divorce, the same shall be divided equally between the parties. Both of the parties understand that there is no obligation on the part of either of them to receive, acquire, or to take property in joint tenancy with the other and that the provisions of this paragraph shall only apply to property formally placed in joint tenancy with the other party and that a joint tenancy shall not be created by implication. For purposes of this Agreement, joint tenancy includes tenancy by the entirety."

The premarital agreement defined marital property as: "Property that is acquired by the parties during marriage and not jointly titled or deemed Separate Property pursuant

2

to this Agreement." The agreement also provided that if the marriage lasted 5 years or more, Grace would receive $500,000 or one-half the fair market value of the marital property, whichever is greater. Finally, the agreement stated: "This Agreement shall be governed and enforced in accordance with the laws of the State of Kansas."

Alan and Grace were married on February 7, 2009. Alan is a real estate attorney at SouthLaw, P.C. Before marrying Alan, Grace was a licensed clinical therapist, but she stopped working in order to spend more time with Alan and her family, as well as travel.

During their marriage, Alan and Grace resided in Leawood, Kansas, but in 2013 they purchased a vacation home in Sanibel, Florida (Sanibel home). The Sanibel home was conveyed by warranty deed to "Alan E. South and Grace Ann Stout South, Husband and Wife." The parties also purchased a 1956 Chevrolet Corvette that was registered and kept in Florida. In November 2013, Alan and Grace bought an equity membership in the Sanctuary Golf Club located in Sanibel. They also purchased an equity membership in the Captiva Island Yacht Club in 2014.

In August 2014, after 5 1/2 years of marriage, Alan and Grace began living separately. Grace remained in the Leawood residence, while Alan moved out. Alan filed for divorce on October 31, 2014.

The district court held a trial on April 3, 2015. The parties presented various issues to the court including spousal maintenance and the lease payments on Grace's Mercedes, but the primary issue at trial was whether the Sanibel home and various items of personal property were joint or marital property under the terms of the premarital agreement. Also at issue was the parties' liability from their jointly filed 2014 income taxes.

At the conclusion of the trial, the district court issued a decree of divorce, but took the property division under advisement and ordered the parties to submit posttrial briefs.

3

The district court informed the parties that it would set out its specific orders regarding the division of assets and liabilities in a separate journal entry. On July 10, 2015, after reviewing all of the parties' posttrial briefs, the district court held a motion hearing to allow counsel to make closing arguments.

On August 23, 2015, the district court issued its memorandum decision. The district court first concluded that the Sanibel home was marital property under the terms of the premarital agreement. Next, the district court determined that certain items of personal property—namely the Corvette, the golf club membership, and the yacht club membership—were also marital property per the premarital agreement. Finally, the district court concluded that the parties' 2014 income tax liability was a marital debt for which the parties were equally responsible, and the district court ordered Grace to reimburse Alan for her share of the taxes that he paid on a portion of his income.

On September 17, 2015, Grace filed a motion for a new trial or to alter or amend judgment. Grace argued that the district court incorrectly classified the Sanibel home and the Corvette, the golf club membership, and the yacht club membership as marital rather than joint property. She also argued that the district court wrongfully concluded that she was responsible for a portion of the parties' 2014 income tax liability. After finding that oral argument would not materially aid the court in resolution of the issues Grace raised in her motion, the district court denied the motion. On November 23, 2015, the district court issued a final journal entry of judgment that incorporated by reference its prior memorandum decision. Grace timely filed a notice of appeal.

SANIBEL HOME

The first issue on appeal is whether the district court erred in classifying the Sanibel home as marital property rather than joint property under the terms of the premarital agreement. Both parties and the district court agree that the premarital

agreement is unambiguous, valid, and enforceable. What they are not in agreement about, however, is whether the Sanibel home should be classified as joint or marital property.

The premarital agreement provides that joint property is property acquired during the marriage and "titled with the other party as joint tenants," including as tenants by the entirety. Any joint property, however, must formally and intentionally be placed in joint tenancy and a joint tenancy cannot be created by implication. Upon divorce, each party is entitled to one-half of the value of the parties' joint property.

Marital property is all property acquired during the marriage that is not jointly titled. Because the marriage lasted longer than 5 years, Grace is entitled to either $500,000 or one-half of the value of the parties' marital property, whichever is greater. The practical effect of Grace's claim if she were to succeed in classifying the Sanibel home as joint property is that she would get $500,000 in addition to half the value of all the joint property, including the Sanibel home. Essentially, Grace advocates for the classification of all of the parties' property as joint property because she would be awarded an extra $500,000 under the terms of the premarital agreement.

The Sanibel home was conveyed by warranty deed to:  "Alan E. South and Grace Ann Stout South, Husband and Wife." In finding that the Sanibel home was marital property, the district court noted that the premarital agreement contained a choice of law provision stating that it is governed by Kansas law. Although in Florida there is a presumption that a deed in both a husband and wife's name creates a tenancy by the entirety, the same is not true under Kansas law. Under Kansas law, simply titling property as husband and wife is not enough to create a joint tenancy or a tenancy by the entirety. Therefore, the district court concluded that the parties' Sanibel home was marital property because it was not formally placed in joint tenancy.

Grace now argues on appeal that the district court erred in classifying the Sanibel home as marital property. Because the property is located in Florida, she claims that the district court should have applied Florida law to determine whether the Sanibel home was joint property or marital property according to the terms of the premarital agreement. Grace argues that the premarital agreement provides that it is governed by Kansas law and this includes Kansas' conflict of law rules. Under Kansas' conflict of law rules, the law of the place where the property is located governs—which is Florida in this case. Under Florida law, Grace contends the Sanibel home is joint property because there is a presumption that property titled to a husband and wife creates a tenancy by the entirety.

Alan disagrees with Grace's contention that Florida law governs the classification of the Sanibel home. Alan points out that the premarital agreement, which is governed by regular contract law, expressly contains a choice of law clause that provides it is governed by Kansas law. According to Alan, this does not include Kansas' conflict of law rules. Alan argues that Kansas courts "favor[] the parties' contractual forum-selection provision to resolve a dispute that is [] contractual in nature." Therefore, Alan argues that the district court correctly applied Kansas law in concluding that the Sanibel home was marital property because, in Kansas, simply deeding a house to a husband and wife is not enough to create a joint tenancy or a tenancy by the entirety.

Resolution of this issue turns on interpretation of the parties' premarital agreement. A valid premarital agreement is a contract subject to the same rules as any other contract. *In re Marriage of Cutler*, No. 103,148, 2011 WL 1877703, at *4 (Kan. App. 2011) (unpublished opinion). An appellate court exercises unlimited review over the district court's interpretation of a contract. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014); see also *In re Marriage of Traster*, 301 Kan. 88, 104, 339 P.3d 778 (2014) (an appellate court may construe a written contract regardless the construction given by the trial court).

6

*Does Kansas law or Florida law govern the classification of the Sanibel home?*

Before reaching the issue of whether the Sanibel home is marital or joint property, we must first address whether Kansas law or Florida law governs the dispute. The premarital agreement expressly provides that it is governed by Kansas law. The issue we must decide is whether this provision means that the premarital agreement is governed by Kansas substantive law or whether it also includes Kansas' conflict of law rules. The resolution of this issue is a question of law over which an appellate court has unlimited review. *Raskin v. Allison*, 30 Kan. App. 2d 1240, 1241, 57 P.3d 30 (2002).

Kansas generally follows the Restatement (First) of Conflict of Laws. *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 538, 44 P.3d 364 (2002). The First Restatement provides that "[t]he nature or the interest in land created by a conveyance is determined by the law of the state where the land is." Restatement (First) of Conflict of Laws § 221 (1934). Regarding marital property, it also states: "The effect of marriage upon an interest of land acquired by either or both of the spouses during coverture is determined by the law of the state where the land is." Restatement (First) of Conflict of Laws § 238 (1934). Therefore, it would appear at first glance that because the Sanibel home is in Florida, whether it is joint property should be determined by Florida law.

The complicating issue, however, is that Alan and Grace included a choice of law provision in their premarital agreement. The question then becomes, does the choice of law clause stating that Kansas law governs the agreement also mean that Kansas' conflict of law rules apply? If so, then as discussed above, Florida law applies. If not, then the choice of law provision means that whether the Sanibel home is joint or marital property is to be determined under Kansas substantive law. Although there is no caselaw directly on point, Kansas courts have discussed the interplay between choice of law provisions and traditional conflict of law rules in cases involving other types of contracts.

Alan cites *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 810 P.2d 1154 (1991), to support his argument that the parties' choice of law clause controls the conflict of law issue here. In that case, the Cates executed various notes with a bank and the issue was whether each of the notes was secured by a mortgage on the Cates' home. Although the Cates' home was located in Kansas, the mortgage contract provided that it would be governed by the laws of Missouri. Applying Missouri law, the district court ruled that the amount secured by the mortgage was limited to one of the notes, and the mortgage did not secure the note on which the Cates had defaulted.

On appeal, the Bank argued that the district court erred when it applied Missouri law to the mortgage contract because regardless of the choice of law provision contained in the contract, the court should have applied the rule that the law of the situs determines the rights and obligations of the parties to real property. The Supreme Court ultimately rejected the Bank's argument and held that because the parties contractually provided that Missouri law would govern the mortgage contract, Missouri law applied even though the property was located in Kansas. See 248 Kan. at 706-07.

The Kansas Supreme Court again addressed the enforceability of a contractual choice of law provision in *Brenner*. In that case, Brenner and Klein, who were both residents of Kansas, had opened brokerage accounts with L.T. Lawrence, a New York company. Oppenheimer, also a New York company, cleared trades with L.T. Lawrence because L.T. Lawrence had no authority to clear trades for itself. L.T. Lawrence, through Oppenheimer, sold unregistered securities to Brenner and Klein, and they brought suit against Oppenheimer for violations of the Kansas Securities Act.

When Brenner and Klein opened their accounts, they signed an agreement with Oppenheimer that contained a choice of law provision stating that New York state law would govern their contract. Under Kansas law, the sale of unregistered, nonexempt securities is prohibited by K.S.A. 17-1255. In New York, however, a clearing broker—

such as Oppenheimer—is not liable for the sale of unregistered securities. The district court ruled that the contractual choice of law provision was enforceable and under New York law Oppenheimer was not liable to Brenner and Klein.

On appeal, Brenner and Klein argued that because Kansas follows the First Restatement, choice of law provisions in contracts are unenforceable. The Kansas Supreme Court disagreed:

> "'When addressing choice-of-law issues, the Kansas [appellate] courts follow the Restatement (First) of Conflicts of Law.' [Citation omitted.] While Kansas courts have followed the Restatement (First) of Conflict of Laws, the Restatement (First) does not either bar or recognize contractual choice of law provisions. Kansas case law and the Uniform Commercial Code, however, recognize the principle of freedom to contract and, under most circumstances, permit parties to choose the law applicable to their agreement." 273 Kan. at 538.

Although the Kansas Supreme Court held that Kansas law permits contractual choice of law provisions, it also recognized an exception where Kansas courts will not apply another state's law, even if contracted for, if the result would be contrary to Kansas public policy. 273 Kan. at 540. Therefore, the court in *Brenner* ultimately determined that there is a strong public policy "in favor of rigid governmental regulation of the sale of securities and the protection of investors" and subsequently declined to apply the law of New York only because it violated this public policy. 273 Kan. at 543.

Another case addressing this issue is *Novak v. Mutual of Omaha Ins. Co.*, 29 Kan. App. 2d 526, 28 P.3d 1033, *rev. denied* 272 Kan. 1419 (2001). Roger Novak, a resident of Kansas, became an insurance agent of Mutual of Omaha Insurance Company (Mutual), a Nebraska corporation. Mutual required new employees to sign a contract that set forth the agent's duties and responsibilities. At issue was a contract provision that limited claims brought by an agent against the company to 1 year after the occurrence of the

9

claim. The contract stated that it would be "'construed in accordance with the laws of the State of Nebraska.'" 29 Kan. App. 2d at 528.

Novak's employment with Mutual was terminated in 1995 due to lack of production. In 1999, Novak joined in a lawsuit with other former Mutual insurance agents who had been terminated, arguing that Mutual breached the contract because it did not pay a promised first-year commission. Mutual moved for summary judgment contending that Novak's claim was barred by the 1-year limitation period per the employment contract. Novak, on the other hand, argued that the contract should be interpreted under Nebraska law and because Nebraska law does not allow parties to contractually shorten the 5-year statute of limitations for a breach of contract claim, his claim was not barred.

The district court found that as the contract was to be performed wholly in Kansas, it was governed by Kansas law, which permits parties to contractually shorten an applicable statute of limitations for breach of contract. The district court applied Kansas law and ultimately found that Novak's claim was barred by the 1-year statute of limitations contained in the contract.

Novak appealed, contending that the contract contained a choice of law provision dictating that Nebraska law must be applied, so his claim was not time barred. Mutual claimed that Nebraska's choice of law rule follows the most significant relationship test and applies that state's laws. Because Kansas had the most significant relationship to Novak's contract, Mutual argued that Kansas law should apply and Kansas should enforce the 1-year limitation provision. This court rejected Mutual's argument noting the case it cited in support of its argument did not contain a choice of law provision. The parties had expressly agreed that Nebraska law would apply to their contract, so this court applied substantive Nebraska law, which prohibits contract provisions that shorten statutory limitation periods. 29 Kan. App. 2d at 536.

Based on the cases discussed herein, it appears that although Kansas generally follows the First Restatement in resolving conflict of law issues, our courts will enforce a valid contractual choice of law provision so long as it does not violate a strong public policy of this state or the chosen state has no relationship at all with the parties or the transaction. Here, there is no reason not to enforce the parties' choice that Kansas law should apply to their premarital agreement. First, Kansas has a significant relationship with the parties and the transaction; Alan and Grace were married in Kansas and lived in Kansas throughout the duration of their marriage. Although the property at issue is located in Florida, this dispute is not really about the Sanibel home. The issue, at its core, is a contractual dispute about how the premarital agreement should be interpreted. Furthermore, there is no indication that applying Kansas law would violate this state's public policy. Thus, we conclude that Kansas substantive law governs the classification of the Sanibel home under the terms of the premarital agreement.

*Is the Sanibel home joint or marital property under Kansas law?*

Having determined that Kansas law governs the parties' premarital agreement, the next question is whether the district court erred in finding that the Sanibel home was marital, rather than joint, property. As discussed above, resolution of this issue requires the interpretation of the parties' premarital agreement, which is a contract subject to traditional rules of contract interpretation. *In re Marriage of Cutler*, 2011 WL 1877703, at *4. This court has unlimited review over the district court's interpretation and legal effect of written contracts. *Prairie Land Elec. Co-op*, 299 Kan. at 366. Moreover, to the extent that resolution of this issue requires statutory interpretation, the interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

"The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined

11

from the language of the contract without applying rules of construction." *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013). Whether a contract is ambiguous is a question of law over which an appellate court has unlimited review. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013). A contract is not ambiguous unless "'two or more meanings can be construed from the contract provisions.'" *Stechschulte*, 297 Kan. at 15 (quoting *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 [2009]).

Here, the premarital agreement is unambiguous. Whether property is joint property or marital property under the premarital agreement depends on how it is titled. The premarital agreement clearly provides that in order for property to be classified as joint property, it must be titled with the other party as "joint tenants and not as tenants in common." Furthermore, property must be "formally placed in joint tenancy with the other party and that a joint tenancy shall not be created by implication."

Alan and Grace did not place the Sanibel home in joint tenancy. The deed was made out to "Alan E. South and Grace Ann Stout South, Husband and Wife"; there is no language referring to a joint tenancy or the parties as joint tenants. Under Kansas law, simply conveying property to a husband and wife is not enough to create a joint tenancy or a tenancy by the entirety:

> "Real or personal property granted or devised to two or more persons including a grant or devise to a husband and wife shall create in them a tenancy in common with respect to such property unless the language used in such grant or devise makes it clear that joint tenancy was intended to be created." K.S.A. 58-501.

A conveyance establishing joint tenancy requires language such as "joint tenants with right of survivorship" or some equivalent indicia of an intent to create a joint tenancy. See, *e.g.,* K.S.A. 58-501; *Sheils v. Wright*, 51 Kan. App. 2d 814, 815, 357 P.3d

12

294 (2015); *Reicherter v. McCauley*, 47 Kan. App. 2d 968, 971, 283 P.3d 219 (2012) ("When considering the ownership of real estate, the law presumes a tenancy in common is created unless the deed or other conveyance creating the estate unequivocally conveys a joint tenancy to two or more persons or entities."); *Commerce Bank v. Odell*, 16 Kan. App. 2d 704, 704, 827 P.2d 1205 (1992) (joint tenancy created by deed issued to "'Melvin W. Odell and Gloria J. Odell, his wife; as joint tenants and not tenants in common'").

As noted by the district court, the intent of the parties to a contract must be determined from the agreement alone if the contract's terms are unambiguous. See *In re Estate of McLeish*, 49 Kan. App. 2d 246, 255, 307 P.3d 221 (2013). "'Thus, "[w]hen a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible."'[Citations omitted.]" 49 Kan. App. 2d at 256. The language used in the deed conveying the house to "Alan E. South and Grace Ann Stout South, Husband and Wife" does not reveal any intent to create a joint tenancy; the evidence and testimony offered about the parties' actual intent regarding the titling of the Sanibel home is irrelevant.

To sum up, Alan and Grace included a valid choice of law provision in their premarital agreement that provides that it is governed by Kansas law. This means that the premarital agreement is to be governed by Kansas substantive law rather than Kansas choice of law rules. Because Kansas substantive law applies here, and because under Kansas law the parties did not formally place the Sanibel home in joint tenancy, we conclude that the district court did not err in finding that the Sanibel home is marital property rather than joint property.

13

Grace next claims that the district court erred in classifying certain items of personal property as marital property rather than joint property. Specifically, she contests the classification of a 1956 Corvette titled in the name of "Grace Ann Stout-South and Alan E. South," a Florida golf club membership issued to "Alan & Grace South," and a Florida yacht club membership issued to "Alan and Grace South."

The parties have resolved any issues regarding the disposition of these items of personal property. Following the dissolution of their marriage, Alan and Grace agreed that the Corvette would be sold and they would split the proceeds of the sale. They also agreed that they would sell the golf club membership back to the Sanctuary Golf Club and equally divide the proceeds. Finally, they agreed that the yacht club membership would be given to Grace and assigned a value of $5,200 to be taken into account in the district court's final division of property. Although Alan and Grace agree on the disposition of the property, they do not agree on the district court's classification of this property as marital. As explained above, Grace argues that the property is joint property because she could potentially be awarded an extra $500,000 under the terms of the premarital agreement if the property is classified thusly.

Resolution of this issue turns on the interpretation of the parties' premarital agreement, which is a contract subject to the same laws of construction as any other contract. See *In re Marriage of Cutler*, 2011 WL 1877703, at *4. An appellate court exercises unlimited review over the interpretation of a contract and is not bound by the lower court's interpretation of the contract. *Prairie Land Elec. Co-op*, 299 Kan. at 366. Also, interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor*, 301 Kan. at 918.

14

As discussed above, because the parties incorporated a valid choice of law provision in their premarital agreement, whether the Corvette, the golf club membership, and the yacht club membership are joint or marital property is to be determined under Kansas substantive law. To be categorized as joint property under the terms of the premarital agreement, property must be formally placed in joint tenancy and explicitly "titled with the other party as joint tenants, and not as tenants in common"; this includes titling property as tenants by the entirety. In Kansas, simply titling property in the name of a husband and wife is not enough to create a joint tenancy or a tenancy by the entirety. See, *e.g., Sheils*, 51 Kan. App. 2d at 815; *Reicherter*, 47 Kan. App. 2d at 971; *In re Estate of Carter,* 6 Kan. App. 2d 934, 937, 636 P.2d 227 (1981) ("The Kansas legislature has seen fit to create a presumption that joint ownership of either real or personal property is held by a tenancy in common rather than a joint tenancy with right of survivorship.").

None of the property at issue here was placed in joint tenancy. Neither the title to the Corvette nor the membership certificates to the golf or the yacht club contain any joint tenancy language which is required by both the premarital agreement and Kansas law to create a joint tenancy. Therefore, under Kansas law, the Corvette, the golf club membership, and the yacht club membership were not formally placed in joint tenancy, so the property is marital property according to the terms of the premarital agreement.

PARTIES' 2014 INCOME TAX LIABILITY

In its memorandum decision, the district court allocated a portion of the parties' 2014 income tax liability to Grace and ordered her to reimburse Alan for her share of the payment he made. In doing so, the district court reasoned that although Alan earned the vast majority of the income, Grace "participated in the enjoyment of this substantial income and will enjoy the financial benefits of some of the assets purchased by this income." Accordingly, the district court found that the parties' income tax liability was a marital debt for which both parties were responsible.

Grace argues that the district court should not have assigned any of the parties' 2014 income tax liability to her because the income the liability stemmed from is solely attributable to Alan. Grace argues that there is no evidence in the record to support the district court's finding that she shared in the enjoyment of Alan's income. She further argues that no evidence exists to affirm the district court's calculation of her tax liability. Finally, Grace argues that assignment of the 2014 incomes tax liability to her violates the terms of the premarital agreement.

Alan argues that the district court did not err in finding that the parties' tax liability was a marital debt and apportioning part of it to Grace. Alan argues that the district court's factual finding that Grace shared in the enjoyment of his income is supported by substantial competent evidence. He denies that the district court abused its discretion when it calculated the parties' respective tax liability. Finally, he argues that allocating a portion of the tax liability to Grace did not violate the terms of the premarital agreement.

A district court has broad discretion in determining the property rights of the parties to a divorce action, and an appellate court will not disturb that decision absent a clear showing of abuse. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002). Judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable; (2) an error of law; or (3) an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). Moreover, the district court's factual findings are generally reviewed under the substantial competent evidence standard. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Substantial evidence is evidence which possesses both relevance and substance and which provides a substantial basis of fact from which the issues can reasonably be resolved. *Wiles*, 302 Kan. at 73.

Grace argues that the district court should not have apportioned any of the tax liability to her on the ground that she participated in the enjoyment of the income. But

16

this court addressed and rejected an argument similar to Grace's in *In re Marriage of Anderson*, No. 95,866, 2007 WL 2080392, at *1 (Kan. App. 2007) (unpublished opinion). Denise Anderson filed for divorce from her husband Patrick in 2001. Following the district court's entry of the final divorce decree in 2004, the IRS assessed an additional joint tax liability of $67,576.16 for the 2000 tax year. Patrick paid the assessment and then sought judgment against Denise for half the liability. After an evidentiary hearing, the district court found that if this issue had been presented at the time of trial, it would have ordered that each party pay half of the additional tax liability and thus ordered Denise to reimburse Patrick for her half of the debt. Specifically, the district court stated:

> "[T]he parties mutually benefitted from income from receipts that each of the parties received during the marriage; that they spent money, they spent common money; they purchased things together, they went on trips together, they built up assets together in this Mission Hills home. The [c]ourt feels that it would have divided that debt 50/50 and, therefore, I'll do that now." 2007 WL 2080392, at *2.

Denise appealed, arguing that she should not have been assigned any of the additional tax liability because it was attributable primarily to Patrick's farming operation. Therefore, as she had nothing to do with the farming operation or the taxes assessed on it, Denise argued that the district court abused its discretion when it "'saddled' her with an obligation for which she had no legal liability." 2007 WL 2080392, at *1. This court rejected Denise's argument and held that the district court did not abuse its discretion in awarding judgment against Denise for one-half of the additional tax assessment explaining that "[it] view[ed] the district court's rationale for dividing the tax liability as one of fairness given the mutual benefit of the income upon which the additional assessment was based." 2007 WL 2080392, at *2.

Grace also argues that the district court's factual finding that she shared in Alan's income was not sufficiently supported by the evidence. However, the record belies Grace's argument. Grace's lifestyle alone provides substantial competent evidence for the

17

district court's finding that she shared in the enjoyment of Alan's income. At trial, Grace stated that virtually all of Alan's earnings were deposited into a bank account that they shared. In 2014, he reported $333,174 in wages, $28,108 in business income, and $541,661 in income from real estate, partnerships, or S corporations; conversely, Grace's total income in 2014 was $2,399, which came from a pension. Yet, during the marriage the parties purchased a vacation home in Sanibel, Florida, that cost over $2 million. They also acquired a golf club membership that cost $100,000; a yacht club membership that cost $6,790 to join, with annual dues of $1,950; and an antique Chevrolet Corvette. At the time of the divorce, Grace leased a Mercedes with a $1,435 monthly payment.

Furthermore, Grace testified at trial that Alan's substantial income allowed her to stop working in 2009 in order to focus on traveling and spending time with their family. Grace stated that during her marriage she had no limitations on her money or spending and she could buy anything she wanted. She also told the district court that she required around $12,000 per month after the divorce in order to maintain the lifestyle to which she had become accustomed. This is substantial competent evidence to support the district court's finding that Grace "participated in the enjoyment" of Alan's income.

Next, Grace claims that there is insufficient evidence in the record to support the district court's calculation of her respective share of the parties' 2014 income tax liability. She argues that Alan asked that she share in the tax liability for $450,000 of his income, which represents 47 percent of his total income of $961,888. Thus, as the total federal tax liability for 2014 is $274,476, Grace argues that the tax liability for $450,000 would be 47% of $274,476, which equals $129,003. Grace contends that she should only have to reimburse Alan for half of that amount, which is $64,501.50.

After concluding that Grace was responsible for a portion of the parties' 2014 income tax liability because she shared in the enjoyment of Alan's income, the court then stated that "any [f]ederal and [s]tate income tax on those amounts claimed as income by

18

[Alan] for the purposes of determining the maintenance calculation, are marital debt for which the parties are equally responsible." The district court reasoned that it would be unfair to allow Alan to claim that for purposes of maintenance certain sources of income should be omitted, but for calculating Grace's tax responsibility they should be counted as income. In a footnote, the court also stated that "under no circumstances can that amount of joint liability exceed $180,855.00."

The district court did not, however, make any finding on the exact dollar amount of Alan's income for maintenance purposes. At trial, Alan argued that his income for maintenance should bet set at $744,930.76. Thus, per the district court's memorandum decision, it would appear that Grace must reimburse Alan for half of the tax liability attributable to that $744,930.76. Complicating the matter, however, is the district court's footnote that the total joint liability cannot exceed $180,855. It is difficult to deduce how the district court reached that sum, especially because this number does not reflect the amount of taxes attributable to Alan's income for maintenance purposes.

Alan argues that Grace should only share in the tax liability associated with the $450,000 Alan deposited into their joint bank account in 2014. According to Alan, the total tax paid on the parties' income in 2014 was $311,359—$274,937 in federal taxes, $13,610 in Kansas state taxes, and $22,812 in Missouri state taxes. Multiplying $450,000 by the total effective tax rate reveals how much tax liability is attributable to that portion of income. Thus, Alan contends that Grace should reimburse him for 40.19 percent of the $450,000 of income she shared in, which equals $180,855—the same number found by the district court as the maximum joint liability. One-half of $180,855 is $90,427.50.

Thus, it appears that the district court accepted Alan's method of calculating the taxes attributable to $450,000 of his total income. However, there are several problems with the district court's findings here. First, the district court was not clear in how it calculated the amount of tax liability for which Grace must reimburse Alan. It is also

unclear why the district court found that the parties' joint liability cannot exceed $180,855 because the only way to reach this number is to use Alan's calculations based on $450,000 of income, but the court ordered Grace to share in the liability stemming from Alan's claimed income for maintenance purposes, which was more than $450,000.

Furthermore, both parties (and possibly the district court) miscalculated the total amount of the parties' 2014 income tax liability: Grace alleges that it is $274,476, but this is only the amount of federal taxes owed. Meanwhile, Alan claims that it is $311,359, but he states that the amount of federal taxes paid was $274,937. The parties' tax return reveals that the total tax liability is $310,898, which came from $274,476 in federal taxes, $13,610 in Kansas state taxes, and $22,812 in Missouri state taxes.

Because of the uncertainty as to how much income Grace must share in the tax liability for, and the potential miscalculations by the district court, this issue is remanded to the district court for clearer factual findings as to how it calculated Grace's share of the parties' 2014 income tax liability. On remand, the district court should calculate a precise dollar amount for which Grace must reimburse Alan for her share of the 2014 income tax liability, and the district court should make specific findings to support its calculation.

Finally, in a single paragraph of her brief, and without any supportive legal authority, Grace argues that ordering that she reimburse Alan for her share of the parties' 2014 tax liability "violates the terms" of the premarital agreement. It does not appear that Grace made this argument below, and the district court did not address the argument in its memorandum decision. Specifically, Grace claims that under the premarital agreement she "is guaranteed $500,000 or half of the fair market value of the marital property, whichever is greater," but if she must reimburse Alan for her half of the tax liability, the total amount that she will receive as a result of the divorce will be reduced. Grace argues that she is "*guaranteed* half the fair market value of the marital property if it is greater than $500,000," and "[a]warding her anything else violates the terms of the Pre-Marital

20

Agreement and should be reversed." Grace appears to be arguing that assigning any portion of the tax liability to her is improper under any circumstances because such a division of the debt violates the terms of the premarital agreement.

Alan disagrees and points to the fact that the premarital agreement is silent in regards to allocation of debts and liabilities. Therefore, Alan argues that the district court is permitted to apportion the parties' debt and the court is not forbidden from allocating any debt to her. Alan argues that the premarital agreement is unambiguous and must be "enforced according to its terms"; to interpret it as prohibiting the district court from allocating debt to Grace would be to add terms that are not present. Therefore, Alan argues that the district court's order did not violate the terms of the premarital agreement.

Paragraph 13(d) of the premarital agreement governs the division of marital property in the event of a divorce. The agreement provides that if the duration of the marriage is greater than 60 months, Grace will receive $500,000 or one-half of the net fair market value of the existing marital property, whichever is greater. The same paragraph defines the "net fair market value of Marital Property" as "the fair market value of the Marital Property as of the termination of the marriage, less debt secured thereby." As to the Sanibel property, for instance, the first mortgage on the property must be considered in determining the net fair market value of the property. However, the parties' 2014 income tax liability is not a debt that is secured by the Sanibel property and should not be considered in determining the net fair market value of the property.

The premarital agreement contains no provisions regarding the allocation of general debts and liabilities of the parties. This means that the division of debts and liabilities following the parties' divorce is to be determined by the district court and is not governed by the premarital agreement. The parties' 2014 income tax liability is such a debt that is not governed by the terms of the premarital agreement, and the district court is free to apportion this debt in any manner that is fair, just, and equitable to the parties.

21

The district court can apportion the parties' 2014 income tax liability without violating the terms of the premarital agreement; the agreement does not "guarantee" that Grace will receive $500,000 or half the fair market value of the marital property *after taking into account* the entirety of the district court's property division. Instead, the premarital agreement simply provides that in the event of a divorce, Grace will receive a certain amount of the marital property depending on the length of the marriage. However, there is nothing in the premarital agreement that indicates that Grace cannot also be ordered to pay any portion of parties' debt, even if this would effectively reduce the total amount of assets she is awarded in the divorce. Grace is asking the district court to add terms to the premarital agreement that are not found therein. We conclude there is no merit to Grace's argument that allocating a portion of the parties' 2014 income tax liability to her violates the terms of the premarital agreement.

Affirmed in part and remanded with directions.

* * *

ARNOLD-BURGER, C.J., concurring in part and dissenting in part: I concur with the decision of the majority in this case that the Florida home and personal property at issue were properly classified by the district court as marital property. I also agree that the case needs to be remanded for the district court to determine the exact tax liability that should be classified as marital debt. But I disagree as to how that liability is applied in this case and question whether the amount of tax liability makes any real difference in the outcome.

Resolution of this issue turns on interpretation of the parties' premarital agreement. A valid premarital agreement is a contract subject to the same rules as any other contract. *In re Marriage of Cutler*, No. 103,148, 2011 WL 1877703, at *4 (Kan. App. 2011) (unpublished opinion); see K.S.A. 2016 Supp. 23-2402(a). An appellate court exercises

22

unlimited review over the interpretation and legal effect of a contract and an appellate court is not bound by the lower court's interpretation of the contract. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014); see also *In re Marriage of Traster*, 301 Kan. 88, 104, 339 P.3d 778 (2014) (an appellate court may construe a written contract regardless of the construction given by the trial court).

The premarital agreement in this case provides that upon divorce, Grace Ann Stout South is entitled to either a lump sum payment of $500,000 or one-half the existing marital property as measured by net fair market value, whichever is greater. Marital property is defined as all property acquired by the parties during the marriage and not jointly titled or deemed separate property under the agreement. In addition, wage income of the parties earned during the marriage is specifically identified as marital property. The meaning of this seems clear. If there is a tax liability due on the wage income it should be deducted from the total value of the martial property to obtain the net value of the marital property. In other words, to the extent that the contract incorporates the general meaning of the term net, which means the amount of the total value remaining after the deduction of expenses or liabilities, then the premarital contract did provide for the treatment of marital debt.

In this case, the parties stated during oral argument that if the Florida real and personal property was considered marital property, the total net fair market value of marital property did not exceed $500,000. This was exclusive of tax liability. So regardless of what the tax liability is in the case, the $500,000 lump sum payment will be the greater of the two. Granted, we are not able to determine from the record the final net fair market value of the marital property. So to the extent the parties may have misspoken during oral argument, the district judge would need to calculate the exact amount of the total income tax liability attributed to the marital wage income so that the over/under $500,000 determination can be made. However, if one-half the net fair market value of the marital property is already less than $500,000 the amount of the tax liability becomes

23

irrelevant. In no event, under my interpretation of the plain language of the premarital agreement, should the tax liability be used to diminish the $500,000 lump sum payment. The $500,000 was clearly a failsafe amount.

In sum, I would order the case remanded for the court to determine the marital income tax liability and subtract that amount from the combined marital property value along with the other appropriate expenses that the court already ordered deducted and are not challenged here. If one-half of the amount remaining is less than $500,000, then I would order the district court to enter a divorce decree awarding the $500,000 lump sum payment to Grace pursuant to the premarital agreement. If the amount is greater than $500,000, then Grace would be entitled to the greater amount.