# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-1091

_____

Smoky Hills Wind Project II, LLC

*Plaintiff - Appellant*

v.

City of Independence, Missouri

*Defendant - Appellee*

_____

No. 17-1171

_____

Smoky Hills Wind Project II, LLC

*Plaintiff - Appellee*

v.

City of Independence, Missouri

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: December 14, 2017
Filed: May 2, 2018

_____

Before SMITH, Chief Judge, KELLY and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

This case involves a "Renewable Energy Purchase Agreement" ("REPA") that resulted from arms-length bargaining between parties with longstanding experience and expertise in the generation and marketing of electrical energy. Smoky Hills Wind Project II, LLC ("Smoky II"), operates a wind farm generating wind energy which it supplies to various customers, known in the energy business as "off-takers." Smoky II is an indirect subsidiary of Enel Green Power North America, Inc., whose parent company is Enel Green Power, SpA., headquartered in Italy. The City of Independence, Missouri ("Independence"), owns and operates Independence Power & Light, a municipal electric system that distributes electricity to its customers. Independence generates electricity from its own generators but also purchases wholesale energy from various suppliers, including Smoky II. Smoky II brought suit for breach of contract when it did not receive payment from Independence on invoices related to curtailed energy. Curtailed energy is wind energy that is not actually produced because the producer is directed to reduce production either because: (1) an off-taker like Independence requests that its share of the production be reduced, or (2) because the regional regulator (in this case Southwest Power Pool) directs reduction based on regional market conditions. Independence counterclaimed.

After a five-day bench trial, the district court[1], having jurisdiction pursuant to 28 U.S.C. § 1332, held Independence liable for certain charges that it found to be "timely-billed" and denied the counterclaims. Having jurisdiction under 28 U.S.C.

_____

[1] The Honorable Roseann A. Ketchmark, United States District Judge for the Western District of Missouri.

-2-

§ 1291, we affirm the judgment of the district court, but for our own reasons as stated below.

## I. BACKGROUND

As is apparent to people only vaguely aware of the energy business, the production and delivery of electricity is a highly regulated industry. The regulatory context governing the relationship between the parties is described in the stipulation of facts provided to the district court prior to trial. The United States electrical energy grid is made up of interconnected transmission systems and local distribution systems. Higher-voltage transmitting facilities deliver electricity to load centers over long distances, while lower-voltage facilities are used to deliver energy to the local consumers. The Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction under the Federal Power Act, 16 U.S.C. §§ 791-828, to regulate the rates, terms, and conditions of electrical transmission service in interstate commerce. FERC, in recent years, has encouraged the creation of non-profit entities called Regional Transmission Organizations ("RTOs") to manage the operation of these systems and the wholesale markets for the energy transmitted by these systems. The North American Electrical Reliability Corporation ("NERC") is a non-profit regulatory authority overseen by FERC. NERC establishes and enforces mandatory reliability standards for the electricity industry, including transmission grid operators. Southwest Power Pool, Inc. ("SPP"), is a FERC-approved RTO that manages transmission systems and the wholesale energy market in the central United States on behalf of a group of utilities and transmission companies in fourteen states, including Kansas and portions of Missouri. SPP and other RTOs commonly operate on a conservative contingency, or N-1, basis. SPP is a NERC regional electric reliability council member and is a NERC Reliability Coordinator. In these capacities SPP is responsible for maintaining reliability of the bulk electric power system in the region in which Independence and Smoky II are located.

On August 14, 2008, the parties entered into a REPA setting forth the terms and conditions for the sale of energy from Smoky II to Independence. Independence is just one of five off-takers who buy portions of the wind energy produced and sold by Smoky II.[2] The parties agree that the REPA is a valid and enforceable contract, supported by adequate consideration.

The Smoky II wind project was only possible with the involvement of tax equity investors. Tax investors are by nature very concerned about minimizing risk and were heavily involved in the negotiation of the REPA. Frank Costanza, the executive vice president of TradeWind Energy, the primary start-up developer of the Smoky II project before it was bought by Enel, testified that his focus "was to make sure that in that contract that the terms and conditions that we agreed on with our counterpart, the utility, would be found acceptable to the tax equity financiers." Costanza stressed that the investors made it plain that they were not interested in absorbing the risk of curtailment, stating "we need to get paid" and "we need to get paid for curtailments."

The parties anticipated curtailment and included provisions in the REPA that govern the allocation of costs associated with curtailment. Under the REPA, curtailments fall into two categories: (1) Economic Curtailments, and (2) Emergency Curtailments.

Specifically, section 7.3(B) provides: "SPP, Interconnection Provider, or Transmission Owner may curtail all or a portion of the delivery of Test Energy or Renewable Energy to Buyer from the Facility. If such curtailment is not an Emergency, then such curtailment shall be considered an Economic Curtailment."

---

[2] The other off-takers are the City of Springfield, Missouri; Midwest Energy, Inc.; Sunflower Electric Power Corporation; and Enel Green Power North America, Inc.

Section 7.3(C) provides that Independence is "obligated to pay for Renewable Energy or Test Energy not delivered due to an Economic Curtailment at the rate set forth in Section 8.2." Section 8.2 provides:

> **Payment during Economic or Emergency Curtailment.** If Seller is unable to deliver energy to the Delivery Point due to an Emergency Curtailment or an Economic Curtailment, (A) the parties shall use reasonable efforts to determine the quantity of Renewable Energy that would have been produced by the Facility had its generation not been subject to Emergency Curtailment or an Economic Curtailment and (B) Buyer shall pay to Seller;
> (1) all amounts that Seller would have received from Buyer under this REPA had production not been so curtailed, and
> (2) the amount of any Tax Benefits to which Seller would have been entitled but does not receive, adjusted upwards for taxes based on the marginal federal and Kansas tax rates.
> Seller shall install sufficient measuring equipment at the Facility to collect data necessary to reasonably determine the amount of Facility generation subject to the Emergency Curtailment or Economic Curtailment. Seller shall install sufficient meteorological towers around the Site or in conjunction with the Wind Turbines to provide the capability of measuring and recording representative wind data twenty four (24) hours per day, which wind data shall be used to calculate any amounts due Seller under this Section 8.2.

Section 1.3(U) of the REPA defines "Emergency Curtailment" as "a curtailment ordered by SPP, Interconnection Provider, or Transmission Owner due to an Emergency." Under section 1.3(T), "'Emergency' means an emergency condition as defined as 'TLR Level 6 – Emergency Procedures' in the SPP OATT Attachment R Transmission Loading Relief Procedure." In the stipulated facts, the parties agree that "[t]he SPP OATT Attachment R Transmission Loading Relief Procedure, referred to in the definition of an Emergency in the REPA, refers to NERC's Transmission Loading Relief ('TLR') Procedures."

Article 9 of the REPA governs the parties' billing and payment process. Section 9.1 provides:

> **Billing Invoices.** The monthly billing period shall be the calendar month. No later than fifteen (15) Business Days after the end of each calendar month, Seller shall provide to Buyer, by first-class mail, an invoice for the amount due Seller by Buyer for the Renewable Energy provided by Seller and purchased by Buyer, under this REPA, during the previous calendar month billing period. Seller's invoice will show all billing parameters, rates and factors, and any other data reasonably pertinent to the calculation of monthly payments due to Seller.

Section 9.3 specifies:

> **Refunds in Event of Emergency Curtailment.** Upon the occurrence of an Emergency Curtailment, Buyer shall submit to Seller documentation reasonably satisfactory to Seller evidencing the date and duration of such Emergency Curtailment. Upon acceptance by Seller of such documentation, Seller shall refund to Buyer such payment related to the Emergency Curtailment on the next monthly invoice.

The REPA specifically notes that the REPA was negotiated at arms length between parties of equal bargaining power by stating at section 1.1(E): "This REPA was negotiated and prepared by both Parties with the advice and participation of counsel. The Parties have agreed to the wording of this REPA and none of the provisions hereof shall be construed against one Party on the ground that such Party is the author of this REPA or any part hereof." Section 1.1(F) requires the parties to "act reasonably and in accordance with the principles of good faith and fair dealing in the performance of this REPA."

Smoky Hills II began delivering energy to Independence in late 2008 or early 2009. From the start the parties followed the billing and payment schedule outlined in Article 9. For some time the parties did not experience any curtailment orders.

-6-

Beginning in March 2012, Smoky II began to receive orders from SPP to curtail. Smoky II was aware of the curtailments at the time they occurred but failed to bill for curtailed energy as the curtailments occurred. In the fall of 2012 Smoky II noticed that the curtailments were becoming more significant and representatives of the company began to look into the reasons for the curtailments. Smoky II contacted SPP to attempt to discern whether the curtailments were "Emergency Curtailments" as defined by the REPA. On January 3, 2013, Smoky II sent Independence a letter informing it that Smoky II had received "an increased number of curtailment directives" and that Independence "may incur some, possibly significant, financial obligations."

On March 12, 2013, Smoky II followed up by telling Independence that it intended to issue revised invoices for 2012 because it believed the curtailments were not the result of an emergency under the REPA and that Independence was obligated to pay for the curtailed energy. On March 26, 2013, Smoky II issued the first invoice to Independence for curtailments. The invoice was for curtailments from March through December 2012, and totaled $331,990.91. This invoice along with eleven subsequent invoices are the subjects disputed at trial. The following chart reflects the twelve disputed invoices:

| Curtailment Date | Invoice Date | Amount Invoiced for Curtailments |
|---|---|---|
| 1. March - December 2012 | March 26, 2013 | $331,990.91 |
| 2. January - March 2013 | April 18, 2013 | $110,832.56 |
| 3. April 2013 | May 7, 2013 | $11,097.22 |
| 4. May 2013 | June 7, 2013 | $7,581.56 |
| 5. June 2013 | July 9, 2013 | $6,303.41 |

| | | |
|---|---|---|
| 6. September 2013 | October 9, 2013 | $4,004.60 |
| 7. November 2013 | January 7, 2014 | $10,111.58 |
| 8. December 2013 | January 8, 2014 | $8,784.92 |
| 9. January 2014 | February 7, 2014 | $42,074.16 |
| 10. February 2014 | June 9, 2014 | $17,294.41 |
| 11. January 2014 adjustments | August 15, 2004 | $8,638.00 |
| 12. July 2014 | September 3, 2014 | $4,487.93 |

At the end of the trial the district court concluded that none of the curtailments at issue was an emergency curtailment as defined in the REPA's plain language. As a result, the trial court concluded that Independence was liable to Smoky Hills II for the timely-billed invoices.

The court denied Independence's counterclaim for breach of contract for untimely billing, concluding: "Based upon the plain language of the Purchase Agreement, Section 9.1 does not apply to curtailed energy. Rather, the Purchase Agreement contains no express time limit with respect to invoices for curtailments."

The court then applied Kansas law requiring that performance must occur within a "reasonable" time. The court weighed the evidence and found that the invoices that were issued more than fifteen days after the month in which the curtailments occurred were not issued within a reasonable time. In a footnote to its conclusions of law, the district court indicated that while it had rejected the application of section 9.1 to billing for curtailed energy, it "ultimately determined that fifteen business days is a reasonable time to submit invoices for curtailments." Thus, the court decided that Independence must pay that portion of the invoice described

at No. 2 attributable to curtailments in March 2013 and the total amounts of the invoices described at Nos. 3, 4, 5, 6, 8, and 9.

## II. DISCUSSION

### A. TIMELINESS UNDER THE REPA

Smoky II primarily contends that the district court "negated" the intent of the parties when it implied a "reasonable time" deadline for billing Independence for the curtailment costs. It also objects to the court's apparent equating of a "reasonable time" with the fifteen-day timely-billing requirement found in the contract.

Independence took the position at trial that the billing requirements of Article 9 of the REPA applied to billing for both curtailed energy and energy actually delivered. On appeal, Independence appears to abandon this argument by stating in its brief that "after concluding that the REPA's express fifteen-day deadline did not apply to curtailment invoices," the trial court's finding that Smoky II had a duty to bill in a reasonable time was supported by the law and the facts. However, later in the brief, Independence takes issue with Smoky II's contention that "REPA section 9.1 applies only to energy invoices, not curtailment invoices." Independence specifically argues:

> First, there is no basis for reading the "Renewable Energy" limitation that appears in the second sentence of section 9.1 into the first sentence of section 9.1. If the parties had intended to have monthly billing periods for energy invoices only, they could have easily said so by simply adding "for Renewable Energy" after "monthly billing period" in the first sentence. And they chose not to do so. Second, the argument ignores the other evidence of the parties' intent that a monthly billing period should apply to curtailment invoices (*e.g.*, the importance of the revenue stream to Smoky Hills and Smoky Hills' course of conduct), evidence that the trial court found persuasive.

The parties agree that the REPA's choice-of-law provision at section 19.13 requires that the REPA "shall be governed and construed in accordance with the laws of the State of Kansas." Accord Gateway Customer Solutions, LLC v. GC Services Ltd. P'ship, 825 F.3d 502 (8th Cir. 2016) (applying Delaware law to interpret and construe contract provisions pursuant to the parties agreement and the choice-of-law provision in the contract).

"We may affirm the judgment of the district court 'on any basis disclosed in the record, whether or not the district court agreed with or even addressed that ground.'" Warner Bros. Entertainment, Inc. v. X One X Productions, 644 F.3d 584, 591 (8th Cir. 2011) (quoting PFS Distribution Co. v. Raduechel, 574 F.3d 580, 591 (8th Cir. 2009). Under Kansas law, appellate courts "exercise unlimited review over the interpretation and legal effect of written instruments, and . . . are not bound by the lower courts' interpretations of those instruments." Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op, Inc., 323 P.3d 1270, 1274 (Kan. 2014) (citing Osterhaus v. Toth, 249 P.3d 888, 896 (Kan. 2011)). "The primary rule for interpreting written contracts is to ascertain the parties' intent" and when the terms of the contract are clear, "the intent of the parties is to be determined from the language of the contract without applying rules of construction." Anderson v. Dillard's, Inc., 153 P.3d 550, 554 (Kan. 2007) (citing Liggatt v. Employers Mutual Casualty Co., 46 P.3d 1120, 1125 (Kan. 2002)). "A document's meaning should be gleaned from the document as a whole rather than 'the critical analysis of a single or isolated provision.'" Water District No. 1 of Johnson County v. Prairie Center Development, L.L.C., et al., 375 P.3d 304, 312 (Kan. 2016) (quoting Marquis v. State Farm Fire & Cas. Co., 961 P.2d 1213, 1219 (Kan. 1998)).

The REPA is a detailed document that precisely indicates the responsibilities of the Seller (Smoky II) and the Buyer (Independence). The entirety of the billing and payment responsibilities of the parties is found in Article 9 of the REPA, which is entitled, "Billing and Payment." Section 9.1 specifically provides for calendar

-10-

month billing. That section further requires that "Seller shall provide to Buyer, by first-class mail, an invoice for the amount due Seller by Buyer for the Renewable Energy provided by Seller and purchased by Buyer, under this REPA, during the previous calendar month billing period." If this were the sole content of Article 9, we might be sympathetic to Smoky II's contention that section 9.1 applies only to actual renewable energy delivered to Independence and that it does not apply to curtailed energy. However, Kansas law requires us to look at the contract as a whole and not isolate a single provision and interpret it out of context. The rest of the REPA, including the rest of 9.1, leads us to conclude that Article 9 controls.

Section 9.1 specifically requires that "Seller's invoice will show all billing parameters, rates and factors, and any other data reasonably pertinent to the calculation of monthly payments due to Seller." Further, section 9.3 specifically addresses curtailments. That section anticipates that in the event of an "Emergency Curtailment" Independence "shall submit to Seller documentation reasonably satisfactory to Seller evidencing the date and duration" of the emergency curtailment and then be entitled to a refund "on the next monthly invoice." The inclusion of language requiring that the invoices show "all billing parameters, rates and factors, and other data" in section 9.1 and the inclusion of the refund provision in 9.3 make it clear that the parties intended that the monthly billing invoices would include all payments owed to Smoky II, for renewable energy, for curtailed energy, or for anything else within the billing parameters.[3]

Smoky II argues the court erred by not considering that Independence was not prejudiced by the delay in billing. This argument lacks merit. The trial court carefully weighed the evidence, including the importance of monthly billing and the

---

[3]The evidence at trial, including the testimony of Enel's Associate Vice President, Mark McGrail, plainly established that Smoky II was able to meet the fifteen business day deadline once it satisfactorily performed its duties under section 8.2 of the REPA.

importance of reasonable performance of contractual obligations. The court specifically noted that the contract required a twenty-year commitment of the parties and the dramatically high billing amounts resulting from delayed billing. These findings of fact are not clearly erroneous.

## B. NATURE OF CURTAILMENTS: ECONOMIC OR EMERGENCY

In its cross-appeal, Independence contends that the district court erred in its interpretation of the meaning of "Emergency Curtailment" in the REPA. We disagree. The plain language of the REPA supports the district court's conclusion.

The language in the REPA defining economic and emergency curtailments is precise and clearly incorporates known terms and standards in the power production and distribution industry. The language specifically defines an emergency curtailment as one ordered by SPP due to an emergency which "means an emergency condition as defined as 'TLR Level 6 - Emergency Procedures' in the SPP OATT Attachment R Transmission Loading Relief Procedure." At trial, Smoky II argued that a curtailment was not an emergency curtailment unless SPP declared it to be a TLR Level 6 curtailment. Independence argued that emergency curtailments were any curtailments of Smoky II's generation or any curtailment incident to certain circumstances listed in one section of TLR Level 6 - Emergency Procedures. The district court was correct in rejecting these arguments.

The district court looked to the plain language of the contract and to NERC's definition of TLR Level 6 - Emergency Procedures. The court recognized that the term "'TLR Level 6 - Emergency Procedures' is defined in NERC's procedures, outside of the contract, and is generally understood within the electric industry to be a procedure used when there is a critical condition on the bulk electric grid." The court concluded:

that the proper interpretation of Emergency Curtailment given the Purchase Agreement's plain language and TLR Level 6's accepted use within the electric industry is any SPP curtailment that is due to a critical condition on the bulk electric grid. Further, SPP, as the entity responsible for implementing NERC's TLR Procedures, describes critical condition to mean "cascading outages" and a "doomsday" scenario where generation is immediately curtailed to zero.

## C. ENERGY ALLOCATION

Independence further argues on appeal that the district court erred when it failed to find that Smoky II had over-allocated energy to Independence beyond the 10.1 per cent share provided in the REPA. We disagree. "Whether a contract has been breached is a question of fact." Waste Connections of Kansas, Inc. v. Ritchie Corp., 298 P.3d 250, 265 (Kan. 2013). We review the district court's findings of fact for clear error, but we review de novo mixed questions of law and fact that require consideration of legal concepts. Stine Seed Co. v. A & W Agribusiness, LLC, 862 F.3d 1094, 1099 (8th Cir. 2017) ("In an 'appeal from a civil bench trial, we review the trial court's findings of fact for clear error. Its conclusions of law are subject to de novo review. Mixed questions of law and fact that require the consideration of legal concepts . . . are also reviewed de novo.'") (quoting Darst-Webbe Tenant Ass'n Bd. v. St. Louis Housing Auth., 339 F.3d 702, 710-11 (8th Cir. 2003)).

The evidence at trial did not support a finding that Smoky II was permitted to adjust the allocation of energy to Independence if another off-taker curtailed its allotment. The court specifically found that "[t]he evidence shows that the parties were aware that they would have to agree on additional day-to-day operating procedures, and the parties filled in the gaps related to their curtailment procedures so that Independence's allocation of energy would be unaffected by a curtailment ordered by another off-taker during times of negative LMP, or otherwise, and would not result in a reduction of Independence's megawatt share of energy to a strict

-13-

percentage of the remaining output." The court further noted that "Independence paid all of its invoices, except for those for the Curtailments, with full knowledge of the exact amount of energy it was allocated, how much other off-takers were allocated, the total wind project production for each allocation, and had access to the level of LMP at the given times."

The district court further recognized that "the procedure now advocated by Independence would leave Independence at the mercy of the other off-takers" when the REPA's clear intent was to allow Independence to control "its own allocation of energy from Smoky II so that it can make an economic decision about what it wants to do with Smoky II's output—whether to receive the energy or self-curtail." The trial evidence clearly supports the district court's rejection of Independence's theory regarding over-allocation of energy.

## D.  SUBSTANTIAL PERFORMANCE

For the first time on appeal, Smoky II alleges that the district court erred by not considering its substantial performance under the contract. We do not ordinarily consider arguments raised for the first time on appeal. United States Securities and Exchange Commission v. Collyard, 861 F.3d 760, 765 (8th Cir. 2017). Smoky II has not persuaded us to abandon this general rule. Accord id. Because Smoky II has waived the issue of substantial performance, we do not address it.

## III.  CONCLUSION

We affirm the judgment of the district court.

_____