NOT DESIGNATED FOR PUBLICATION

No. 118,302

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ASSOCIATES OF TOPEKA, LLC, d/b/a RE/MAX ASSOCIATES OF TOPEKA, LLC, and
MARY F. FROESE,
*Appellants*,

v.

SARGENT APARTMENT VENTURE, LLC,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed July 27, 2018.
Affirmed.

*John R. Hamilton*, of Hamilton, Laughlin, Barker, Johnson & Jones, of Topeka, for appellants.

*R. Patrick Riordan*, of Riordan, Fincher, Sinclair & Beckerman, PA, of Topeka, for appellee.

Before ARNOLD-BURGER, C.J., HILL and BUSER, JJ.

PER CURIAM: A condition precedent is something that must happen or be
performed before a right can occur to enforce a contract. Without the completion of an
existing condition precedent a contract cannot be enforced. *Weinzirl v. The Wells Group,
Inc.*, 234 Kan. 1016, 1020, 677 P.2d 1004 (1984). In this case, RE/MAX Associates of
Topeka, LLC, (REMAX), through its salesperson, Mary Froese, and Sargent Apartment
Venture, LLC (Sargent) entered into an agreement which permitted REMAX to show
Sargent's Apartments (Apartments) to a prospective buyer. If the prospective buyer
ultimately purchased Apartments, Sargent would pay a commission to REMAX. The

1

prospective buyer was a group of four individuals who ultimately did not purchase Apartments as a group of four. Instead, several months later, two of the four purchased Apartments. Sargent refused to pay REMAX a broker's commission. The district court entered summary judgment against REMAX and Froese, holding that the condition precedent was not met so the contract was unenforceable. The district court also held that even if the condition precedent were met, the contract was unenforceable due to public policy. REMAX and Froese appeal. Because we find, as did the district court, that the condition precedent—purchase by a distinct set of four individuals—did not occur, the contract was unenforceable. Accordingly, we affirm.

FACTUAL AND PROCEDURAL HISTORY

The facts here are, for the most part, uncontested. In June or early July 2014, REMAX contacted B.J. McGivern, the son of John F. McGivern, II (Jack McGivern), to tell him that REMAX had a buyer looking to purchase an apartment complex. REMAX wanted to know if Jack McGivern had an apartment complex for sale. At the time of the call, the Apartments were not actively marketed for sale. Sargent owned the Apartments. Jack McGivern was the managing member of Sargent. The Apartments were not listed for sale with any broker or salesperson.

The following month, REMAX invited Daryl Rakoski to an investor meeting. At the investor meeting, Rakoski approached Froese, an affiliated licensee of REMAX, to see if she knew of anyone selling an apartment complex. Froese did not mention the Apartments at that time. Later that month, REMAX emailed Sargent indicating that REMAX had a "pre-approval letter on the buyer." REMAX sought a time to inspect the Apartments. Along with the email, REMAX included a "Permit to Show and Agency Disclosure (Designated Buyer's Agent)" which REMAX asked Sargent to sign and return. Sargent altered some terms of the agreement and returned it by email to REMAX.

2

On September 4, 2014, REMAX agreed to the altered terms. The agreement reads, in pertinent part:

"The Seller consents to allow the agent named below, licensed by the state of Kansas with RE/MAX Associates of Topeka, LLC, to show the above property to a prospective Buyer. Should the showing result in a sale between prospective Buyer & Seller, then Seller agrees to pay a brokerage fee to RE/MAX Associates of Topeka, LLC, which shall be due at closing and will be subtracted from the proceeds of the sale, or if none are forthcoming, said brokerage fee shall be paid in certified funds to the settlement company which shall then forward those funds to RE/MAX Associates of Topeka, LLC. Said fee shall be 3.5% of sold price – PROVIDING THE BUYER PAYS NO ADDITIONAL COMMISSION.

"(DESIGNATED BUYER'S AGENT):  Mary Froese of RE/MAX Associates of Topeka, LLC, is acting as agent of the proposed Buyer with a duty to represent the proposed Buyer's interest only and will not represent the Seller. RE/MAX REMAX of Topeka, LLC, or its agent represents the Buyer only, and has no agency relationship written, oral, or implied with the Seller. The Seller understands that any information given to the Buyer's agent will be shared with the proposed Buyer.

"A Seller's Property Disclosure form and a Lead Paint Disclosure form shall be completed by the Seller and shall become a part of this agreement with signatures and dates of both Seller and prospective Buyer as a condition of this sale."

That same day Froese took Rakoski and Yusuf Abu-Hatoum to inspect the Apartments. The next day, REMAX emailed Rakoski with a draft real estate contract. The name of the buyer was left blank. Later that same day REMAX sent a second draft real estate contract to Rakoski with the buyers listed as "Daryl & Corinne Rakoski, (H&W) and Yusuf & Lina Abu-Hatoum (H&W)." REMAX told Rakoski that since there were four buyers, he would need to "print, sign/initial and forward on to your partners." A few days later, Abu-Hatoum sent REMAX an executed proposed real estate contract. The proposed contract was sent to Sargent, along with an earnest money check, a prequalifying letter from

3

Lyndon State Bank, and a document listing Sargent's estimated closing costs. Sargent did not accept the offer.

A few days later, Abu-Hatoum emailed REMAX and Rakoski and informed REMAX that he and his wife did not wish to continue with the plan to purchase Apartments until he and Rakoski created a limited liability company. Ultimately, Abu-Hatoum and Rakoski did not form any entity or partnership to purchase the Apartments. The proposed deal in which Daryl and Corinne Rakoski and Yusuf and Lina Abu-Hatoum would purchase Apartments fell apart.

In early October 2014, Rakoski and his wife signed a new draft real estate contract. But they were unable to obtain financing and the deal fell through.

In February or early March 2015, Rakoski met with Jack McGivern to discuss Rakoski or an entity that he and his wife had formed, RAK Property Management, LLC (RAK), leasing the Apartments. In late March 2015, Sargent and RAK entered into a lease agreement which contained a purchase option. Rakoski and his wife are the sole members of RAK. Rakoski and his wife also guaranteed the obligations of RAK under the lease. Under the lease, RAK could purchase the assets owned by Sargent, including the Apartments. The purchase option was assignable.

In March 2016, RAK exercised its option to purchase under the lease. RAK assigned its rights under its option to purchase to a new entity also formed by Rakoski and his wife, Sargent Apartments, LLC (not to be confused with McGivern's group, herein referred to as Sargent). Sargent Apartments, LLC purchased the Apartments for $2,100,000.

Sargent did not pay REMAX the brokerage fee under the September 4, 2014 Permit to Show agreement.

4

On April 20, 2016, REMAX, under the name RE/MAX Associates of Topeka, LLC, filed a petition alleging that Sargent breached the contract by refusing to pay the brokerage fee. On June 29, 2016, an amended petition was filed which included Froese as a plaintiff. In addition, the amended petition stated that Froese entered into the Permit to Show agreement and that her showing the property in March 2015 led to a buyer.

In February 2017, both parties filed motions for summary judgment. REMAX sought summary judgment on the breach of contract claim. Sargent sought summary judgment arguing that (1) Froese was not a party to the Permit to Show agreement and had no breach of contract claim; (2) the Permit to Show agreement was only good for one specific prospective buyer who ultimately did not purchase the Apartments; (3) REMAX was not entitled to a brokerage fee because there was no agreement from the prospective buyer and Sargent to pay the fee; (4) the Permit to Show agreement expired before the sale of the Apartments; and (5) neither Froese nor REMAX were entitled to attorney fees.

On March 16, 2017, REMAX responded to Sargent's motion for summary judgment. In the response, REMAX claimed that summary judgment was inappropriate because Froese was entitled to a commission under common law principles. Sargent argued against the merits of REMAX's new claim, while also arguing that the claim was procedurally barred because of its lateness.

The district court granted Sargent's, and denied REMAX's, motion for summary judgment in August 2017. The court held that the Permit to Show agreement contained a condition precedent which required Sargent to pay a commission if Daryl and Corinne Rakoski and Yusuf and Lina Abu-Hatoum, as a group of four, purchased the Apartments. The court also held that the Permit to Show agreement was between REMAX and Sargent and that Froese was not a "real party in interest" in the case because she had "no contractual right to recover any damages" from the suit. Finally, the court held that even if the condition precedent were established, REMAX would have been unable to recover

a brokerage fee because the agreement was outside a stated agency agreement. REMAX and Froese appeal the district court's ruling.

ANALYSIS

REMAX and Froese contend that the district court erred in granting summary judgment to Sargent. Where there is no factual dispute, appellate review of an order regarding summary judgment is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

*The district court did not err in holding that the brokerage agreement could not be enforced because a condition precedent existed and the condition precedent was not met.*

REMAX first argues that the Permit to Show agreement's reference to "buyer" did not mean the Rakoskis and the Abu-Hatoums as a group of four. Instead, REMAX argues that because two of the four ultimately purchased the property, the condition precedent of the Permit to Show agreement was satisfied. On the other hand Sargent argues that the Permit to Show agreement's reference to "buyer" was a distinct group of four people: Daryl and Corinne Rakoski, and Yusuf and Lina Abu-Hatoum. Sargent then argues that because the group of four did not purchase the Apartments, the condition precedent in the Permit to Show agreement was not satisfied.

*Standard of review for contract interpretation*

When interpreting a contract the appellate court is not bound by the lower court's interpretation of the writing. *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014). The question of whether a written instrument is ambiguous is a question of law subject to de novo review. *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 964, 298 P.3d 250 (2013).

6

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.'" *Stechschulte v. Jennings*, 297 Kan. 2, 15, 298 P.3d 1083 (2013). When a contract is ambiguous the court may resort to extrinsic evidence to resolve the ambiguity. *Botkin v. Security State Bank*, 281 Kan. 243, Syl. ¶ 6, 130 P.3d 92 (2006). "Ambiguity exists if the contract contains provisions or language of doubtful or conflicting meaning." *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002).

*The Permit to Show agreement clearly and unambiguously refers to one singular buyer, not any buyer.*

REMAX's argument hinges on the idea that the Permit to Show agreement did not refer to "any particular person or persons." If REMAX is correct, then REMAX would have been due a commission under the agreement regardless of whether the Rakoskis and Abu-Hatoums or just the Rakoskis purchased the property. But if the Permit to Show agreement referred to a particular person or persons then REMAX would only be due a commission, under the agreement, if that particular person or persons purchased the property. To determine whether the Permit to Show agreement referred to a particular person or persons requires this court to examine the language of the agreement. If the agreement is ambiguous, this court can examine extrinsic evidence to resolve the ambiguity. *Botkin*, 281 Kan. 243, Syl. ¶ 6.

The language in the Permit to Show agreement itself does not appear to be ambiguous. The agreement refers only to buyer in the singular. For example, the agreement allowed Froese to show the property to "a prospective Buyer" and should the showing result in a sale between "prospective Buyer & Seller," then a brokerage fee would be paid. The agreement also references "the proposed Buyer" three times and "the

7

Buyer" twice. The agreement also states "(DESIGNATED BUYER'S AGENT): Mary Froese" which seems to strongly support that the agreement referred to a single buyer.

REMAX's explanation that the Permit to Show agreement did not refer to a particular "person or persons" is unpersuasive. The Permit to Show agreement states that Froese was acting as a designated buyer's agent. If REMAX's interpretation of the Permit to Show agreement was correct they would not be acting as an agent for the buyer. Instead, it would be more accurate to say REMAX was an agent for Sargent—an agent seeking any buyer at all. Yet the plain language of the agreement shows that REMAX was working as a buyer's agent.

The Permit to Show agreement refers to a single buyer, but it is ambiguous on the identity of the buyer. Because the agreement is ambiguous on who the buyer is, this court can look to the extrinsic evidence to resolve the ambiguity. See *Botkin*, 281 Kan. 243, Syl. ¶ 6.

*The buyer contemplated by the Permit to Show agreement was a group of four individuals.*

The evidence here shows that the Permit to Show agreement designated the buyer as a group of four individuals: Daryl and Corinne Rakoski and Yusuf and Lina Abu-Hatoum. In a late August email, Froese indicated that she had "received [the] pre-approval letter on the buyer." The preapproval letter indicated that Daryl Rakoski "and certain partners" were prequalified to receive funds to purchase the Apartments. The email went on to state that "Buyer would then write an offer with the contingency of viewing all units." She also attached the first draft of the Permit to Show agreement. In another email a few days later, Froese discussed Sargent's changes to the Permit to Show agreement and stated that she would not "take any additional commissions from Buyer."

8

After the Permit to Show agreement was in place, Froese took Daryl Rakoski and Yusuf Abu-Hatoum to inspect Apartments. Froese then emailed Daryl Rakoski a draft real estate contract. The draft contract did not name the buyer because Froese did not know what the "Buyer name" should be. Froese then emailed another draft real estate contract to Daryl Rakoski. The body of the email stated "Please review and because there are four buyers, I will need you to print, sign/initial and forward on to your partners." The draft contract lists the buyer as: "Daryl & Corinne Rakoski, (H&W) and Yusuf & Lina Abu-Hatoum (H&W)." As contemplated by the contract, the buyer is that specific group of four individuals.

*The condition precedent was not satisfied when Daryl and Corinne Rakoski purchased the Apartments.*

> "A condition precedent is something that is agreed must happen or be performed before a right can occur to enforce the main contract. It is one without the performance of which the contract entered into between the parties cannot be enforced. A condition precedent requires the performance of some act or happening of some event after the terms of the contract, including the condition precedent, have been agreed on before the contract shall take effect." *Weinzirl*, 234 Kan. at 1020.

The Permit to Show agreement contains a condition precedent. The contract states: "should the showing result in a sale between prospective Buyer & Seller, then Seller agrees to pay a brokerage fee to RE/MAX Associates of Topeka, LLC." The question here is whether that condition precedent was met when a subset of the buyer, as contemplated by the Permit to Show agreement, ultimately purchased the property?

On these facts, the condition precedent was not satisfied. The Permit to Show agreement contemplated a partnership of four individuals, the Rakoskis and the Abu-Hatoums, purchasing the Apartments. Those four did not purchase the property. Instead, the Rakoskis purchased the property on their own and at a much later date. There is a real

difference between buyer as contemplated by the Permit to Show agreement, the Rakoskis and the Abu-Hatoums, and the Rakoskis alone. As Froese stated in her deposition: "If you are in a relationship we're going to go buy a house together, then that falls apart, then I go buy it by myself, those are two different buyers." The same thing happened here, just the Rakoskis is not the same as the Rakoskis and the Abu-Hatoums.

Because the condition precedent was not satisfied, Sargent was not obligated to pay the brokerage fee under the contract. See *Weinzirl*, 234 Kan. at 1020.

*The district court erred in holding that the failure to set forth the compensation of the broker in the agency agreement precludes the broker from being compensated.*

The district court held, in the alternative, that the Brokerage Relationships in Real Estate Transactions Act (BRRETA) requires compensation to come from the agency agreement. Although our holding that the condition precedent was not satisfied is dispositive, we will examine the district court's alternative finding.

*Standard of review*

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. 304 Kan. at 409.

10

*The failure of REMAX to have an agency agreement setting out compensation does not, by itself, preclude recovery.*

To create an agency relationship under BRRETA, "a broker shall enter into a written agency agreement with the party to be represented no later than the signing of an offer to purchase or lease." K.S.A. 2017 Supp. 58-30,103(e). The "agency agreement or written transaction brokerage agreement shall set forth . . . the terms of compensation." K.S.A. 2017 Supp. 58-30,103(f). The Legislature readdressed compensation in K.S.A. 58-30,105(a) stating: "compensation is presumed to come from the transaction and shall be determined by agency or transaction broker agreements entered into pursuant to K.S.A. 58-30,103."

The district court held that the above statutes required compensation to come from an agency agreement and that failure to have an agreement precluded recovery in any form. Ultimately, the district court held "that any outside contract for compensation, other than stated in an agency agreement, is void as against public policy." But the district court did not seem to address, beyond a mere mention, REMAX's argument that K.S.A. 58-30,101(b) allowed for compensation outside the agency agreement.

Under K.S.A. 58-30,101(b) "[f]ailure to comply with any requirement of K.S.A. 58-30,103 . . . shall not by itself render any agreement void or voidable nor shall it constitute a defense to any action to enforce such agreement or any action for breach of such agreement." Sargent argues that K.S.A. 58-30,101(b) does not apply to this case because the district court reached its decision based on K.S.A. 58-30,105(a). However, this argument ignores the fact that K.S.A. 58-30,105(a) specifically refers to K.S.A. 2017 Supp. 58-30,103. Under a plain reading of the statutes, compensation "shall be determined by agency or transaction broker agreements entered into pursuant to K.S.A. 58-30,103," but the failure the enter into a written agency agreement, or include terms of compensation in the agreement, does not "render any agreement void or voidable" or

11

"constitute a defense . . . to enforce such agreement." K.S.A. 58-30,101(b); K.S.A. 2017 Supp. 58-30,103(e)-(f); K.S.A. 58-30,105(a). If a written agreement or the terms of compensation are not required it is nonsensical to hold that the failure to have an agency or transaction broker agreement eliminates a broker's ability to be compensated. Therefore, the district court erred in holding that compensation can only come from an agency agreement.

*REMAX cannot recover on behalf of Froese under a common law claim of quantum meruit, because Froese has no such claim.*

REMAX also argues that, even if the Permit to Show agreement is unenforceable, Froese is owed a commission under common law principles. In response, Sargent argues that REMAX is procedurally barred from making the argument because: (1) the claim was untimely raised below, and (2) the district court ruled that Froese was not a real party in interest to the suit and Froese does not appeal that decision.

*REMAX's claim was properly raised.*

While REMAX and Froese raised their common law claim late in the summary judgment process this court can still reach the issue. Generally, pleadings can be amended or supplemented, with the court's consent, at any time before trial. See K.S.A. 2017 Supp. 60-215(a). Sargent argued in the district court that it would be prejudiced if the court allowed the common law claim to proceed. However, Sargent does not appear to be prejudiced. This court reviews summary judgment issues de novo when the facts are uncontested. *Martin*, 297 Kan. at 246. The facts are, for the most part, uncontested. Sargent briefed the issue for this court, but did not allege prejudice in its brief. Accordingly, we will address REMAX's common law claim, although for the reasons stated find it to be unpersuasive.

12

*Froese cannot personally recover from Sargent under a common law theory of*
*quantum meruit.*

REMAX argues that Froese can recover under a quantum meruit claim because Froese produced a willing, able, and ready buyer and because she was the efficient and procuring cause of the sale. In response, Sargent primarily argues that Froese cannot recover because under Kansas law a salesperson may not receive a commission from anyone but his or her broker. Both parties agreed that Froese is a licensed salesperson and an affiliated licensee of REMAX.

When the Legislature has spoken about a topic, the legislative statement supersedes the common law. See K.S.A. 77-109; *In re Marriage of Traster*, 301 Kan. 88, 108, 339 P.3d 778 (2014). Under the Real Estate Brokers' and Salespersons' License Act a "salesperson or associate broker shall [not]: . . . accept a commission or other valuable consideration from anyone other than the broker by whom the licensee is employed or with whom the licensee is associated as an independent contractor" unless certain exceptions apply. K.S.A. 2017 Supp. 58-3062(b)(1). In this case the exceptions are not applicable. See K.S.A. 2017 Supp. 58-3062(b)(1)(A)-(B). Additionally, as stated above compensation should come from the agency agreement. K.S.A. 58-30,105(a). But even if we assumed the requirement of K.S.A. 58-30,105(a) is better described as directory as opposed to mandatory, a separate, but related, act states that a salesperson may not accept a commission from someone other than their broker. K.S.A. 2017 Supp. 58-3062(b)(1). The latter statute does not contain language indicating that it is directory, which the Legislature knew how to do. See K.S.A. 58-30,101(b).

Generally, a real estate agent or broker is entitled to a commission if he or she (1) produces a buyer who is able, ready, and willing to purchase the property and (2) is the efficient and procuring cause of the sale. See *Stewart Title of the Midwest v. Reece & Nichols Realtors*, 294 Kan. 553, 569, 276 P.3d 188 (2012). The court in *Stewart Title* did

13

not address the prohibition of a salesperson accepting a commission from anyone other than the salesperson's employing broker as set out by K.S.A. 2017 Supp. 58-3062(b)(1). There does not appear to be any caselaw addressing K.S.A. 2017 Supp. 58-3062(b)(1). However, the plain language of the statute precludes a salesperson from accepting a payment from anyone other than his or her employing broker. See K.S.A. 2017 Supp. 58-3062(b)(1). Therefore, the common law claim for quantum meruit is precluded because the Legislature has spoken about the area of compensation for salespersons. See K.S.A. 2017 Supp. 58-3062(b)(1); K.S.A. 77-109.

Froese was acting as a salesperson here. Her broker was REMAX. Froese cannot accept a payment from someone other than her employing broker, REMAX. K.S.A. 2017 Supp. 58-3062(b)(1). Notably, REMAX does not argue that it is entitled to a common law remedy; instead, REMAX focuses solely on Froese personally recovering. Under Kansas law, Froese cannot personally recover from Sargent. This is also the basis upon which the district court held that Froese was not a real party in interest, a holding she did not appeal. We find no error by the district court in its holding.

Affirmed.